Peter WASYLOW, Plaintiff,

v.

GLOCK, INC. and Glock Ges.m.b.H., Defendants.

Civil Action No. 94–11073–DPW.

United States District Court, D. Massachusetts.

April 4, 1996.

## MEMORANDUM AND ORDER

WOODLOCK, District Judge.

A 23–year–old worker in a sheriff's office, while storing his weapon at home, pulled the trigger, and shot himself in the stomach. In this products liability lawsuit, he blames the gun and its manufacturer for his self-inflicted wounds. The defendant/manufacturers[1] move for summary judgment. Concluding that there were adequate warnings regarding the use of the weapon and that the gun did what it was designed and manufactured to do when someone pulled the trigger while the weapon was loaded, I will grant defendants' motion.

### I. Background

#### A. The Accident

On September 18, 1993, Peter Wasylow sustained a gunshot wound to the abdomen after he intentionally depressed the trigger while pointing the gun toward his abdomen. (Defs.' Mem. Supp. Mot. Summ. J., Ex. B (hereinafter "Wasylow Dep.") at 171–72, 254.) At the time, Wasylow was in his bedroom in his parents' house in Taunton, Massachusetts. During the relevant time period, Wasylow worked for the Bristol County Sheriff's Department, was a student in a correctional facilities program, and had recently completed a four-hour firearm safety class. (Defs.' Mem. Supp. Mot. Summ. J. at 3; Wasylow Dep. at 202.) Wasylow states that he did not intend to shoot himself. (Wasylow Dep. at 254.) He, however, concedes that he was "in a hurry" because friends were coming over. (Wasylow Dep. at 152, 164.)

Wasylow states that he thought the gun was unloaded at the time, and that he was preparing to store the gun in its case, the Glock box.[2] (Pl.'s Mem. Opp'n Mot. Summ.

Paul F. Wynn, Wynn & Wynn, Raynham, MA, Mark R. Karsner, Karsner & Meehan, Taunton, MA, for Plaintiff.

John F. Renzulli, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, John B. Connarton, Jr., Maria E. Ciampa, Connarton, Wood & Callahan, Boston, MA, for Defendants.

1. The parties do not distinguish between the two named defendants against whom parallel and matching claims are made. Thus, Counts I, III, V and VII are asserted against the American Glock corporation, Glock Inc. and Counts II, IV, VI and VIII are asserted against the Austrian Glock entity, Glock Ges.m.b.H. The two defendants will be referred to collectively as Glock.

2. I note that there is some discrepancy regarding what Wasylow was doing with the gun before it discharged and where the Glock box was located. His mother, Elaine Wasylow, stated that he had just returned from target practice and was preparing to clean the gun when it discharged. (Defs.' Mem. Supp. Mot. Summ. J., Ex. G (police report) at 2.) The police report makes no reference to a storage case being in Wasylow's bedroom. In any event, I find that this factual discrepancy is not material because Wasylow has admitted pulling the trigger before the gun was ever put inside the box. (Defs.' Mem. Supp. Mot. Summ. J., Ex. B (Wasylow Dep.) at 171–72.) I

J. at 2; Wasylow Dep. at 171.) He asserts that because of the discharge, he sustained scarring on the abdomen and back, loss of a kidney, injury to the bowel necessitating a colostomy bag, injury to the liver, pain, loss of strength, and permanent disability. He reports $35,000 in medical bills. (Jt. Pre-Trial Mem. at 1.)

Police Sergeant Michael J. Silvia ("Silvia") responded to the scene and reported a single gunshot wound to the abdomen; the wound appeared to be self-inflicted. (Defs.' Mem. Supp. Mot. Summ. J., Ex. G (police report) at 1–2.) Silvia investigated the premises with Detective Dykas and recovered the Glock Model 21, 45 ACP pistol serial number WC228US, on the floor at the foot of the bed.[3] *Id.* Sylvia reported one spent shell in the chamber and twelve rounds of similar ammunition in the magazine, which was still in place in the pistol.[4] (Defs.' Mem. Supp. Mot. Summ. J., Ex. G (police report) at 1); Ex. F (Silvia Dep. at 46.)

B. *The Handgun and the Warnings Regarding It*

Wasylow purchased the handgun, a semi-automatic pistol, on January 16, 1992, from Foster's Gun Shop in Taunton, Massachusetts. (Defs.' Mem. Supp. Mot. Summ. J. at 3.) Wasylow had used the handgun for target shooting with no malfunction on at least two occasions prior to the incident; he agreed that he liked the "way it handled," and that it was "fine." (Wasylow Dep. at 125.) Wasylow's firearm consultant, Stanton O. Berg ("Berg") has since test fired the handgun and reported that all functions were normal. (Defs.' Mem. Supp. Mot. Summ. J., Ex. H *and* Pl.'s Mem. Opp'n Mot. Summ. J., Ex. E (hereinafter "Berg report") at 2, 12.)

At the time of purchase Wasylow received 1) an "Instructions for Use" manual ("In-

structions manual"), 2) a "Basic Rules of Firearm Safety" booklet ("Basic Rules booklet"), and 3) a storage case with warning labels affixed. (Defs.' Mem. Supp. Mot. Summ. J., Exs. D, E.) The cover of the Instructions manual reads:

**WARNING:** READ THIS MANUAL AND ANY ACCOMPANYING LITERATURE BEFORE REMOVING THIS FIREARM FROM ITS PACKAGE.

**CAUTION:** THIS FIREARM LIKE MOST MODERN REVOLVERS, OR AUTO LOADING PISTOLS, IS DESIGNED WITHOUT AN EXTERNAL MANUAL SAFETY. THEREFORE IT SHOULD BE CONSIDERED AS LOADED AND READY TO FIRE, UNLESS FIRST THE MAGAZINE HAS BEEN REMOVED AND THEN THE CHAMBER CHECKED AND VERIFIED AS EMPTY–UNLOADED.

(bold and capitals in original). Additional warnings and cautions appear on the first page of the manual, including: "your safety and the safety of others (including your family) depends on your mature compliance . . . and constant employment of safe practices," and

CAUTION: IT IS POSSIBLE THAT A ROUND MAY BE IN THE CHAMBER WHEN A LOADED OR EMPTY MAGAZINE IS BEING REMOVED OR INSERTED. ANY ROUND IN THE CHAMBER WILL DISCHARGE UPON PULLING THE TRIGGER WITH THE MAGAZINE INSERTED OR REMOVED.

(Instructions manual at 1) (capitals in original). Accordingly, the manual warns that the user should use "extreme caution after removing the magazine and personally must verify that the chamber is also empty." *Id.* Again, the manual instructs that a user should assume the firearm is loaded until he

---

accept, however, for purposes of this motion, that Wasylow's intention was to pull the trigger because he was preparing to place the gun in the storage container.

**3.** The pistol was removed from the scene by Silvia. (Defs.' Mem. Supp. Mot. Summ. J., Ex. G at 2.) On November 10, 1994, this court granted a protective order directing that the pistol and storage case be retained in the exact condition

they were in at the time of the commencement of this action. (Docket # 12.)

**4.** Viewing the facts in the light most favorable to the non-moving party, I must accept Wasylow's assertion the magazine was *not* in the pistol at the time of the discharge because he had previously removed it. (Pl.'s Mem. Opp'n Mot. Summ. J. at 3; Ex. C at 164.)

has "inspected the chamber and completed the unloading procedures." *Id.* Further safety instructions appear on pages three and five of the Instructions manual:

> THE PISTOL HAS NO OUTSIDE LATERAL SAFETY LEVER AND NO GRIP SAFETY DEVICE. IT IS FIRED LIKE A DOUBLE–ACTION REVOLVER BY SIMPLY PRESSING THE TRIGGER FOR COMMERCIAL USE. ALWAYS KEEP THE GUN UNLOADED. WITH THE GUN LOADED DO NOT TOUCH THE TRIGGER UNLESS YOU INTEND TO FIRE.

(Instructions manual at 5) (emphasis in original).

Additional "General Precautions" admonish: "Handle your pistol as if it were loaded," "Never point your pistol at anything you do not intend to shoot," and "MAKE SURE that no round is in the chamber." (Instructions manual at 5, 9) (emphasis in original). Finally, the manual advises, "Always make sure your pistol is not loaded before cleaning [or] storing . . . ." (Instructions manual at 11.) This warning is repeated in the section describing "unloading" procedures (Instructions manual at 21), and again in the section describing cleaning procedures. (Instructions manual at 23.)

Wasylow also received the Basic Rules booklet, complete with pictures; it warns:

> **1. Handle all firearms as if they were loaded.** . . .
>
> **2. Always keep the firearm pointed in a safe direction.** . . . **Remember:** *You should never point a gun (whether loaded or unloaded) at another person or at yourself* . . . .
>
> **5. Whenever you handle a firearm, the first thing you should do (while keeping it pointed in a safe direction with your finger outside the trigger guard) is to open the action to determine whether or not the firearm is loaded.**
>
> **6. Thoroughly read the instruction manual supplied with your firearm.**

(Basic Rules booklet at 1–3) (emphasis in original).

In addition, bright yellow stickers affixed to the storage case read as follows:

a. **WARNING:** THIS BOX IS DESIGNED TO STORE AN UNLOADED WEAPON ONLY. DO NOT ATTEMPT TO STORE A LOADED WEAPON IN THIS BOX.

b. **DO NOT STORE LOADED PISTOL.** [This appears on two stickers, together with pictorials and the international symbol of "Ө"—for "no" —in red over the loaded chamber.]

c. **DANGER.** If the trigger is in the forward position STOP. The pistol may be loaded! To unload the pistol, see the instructions on the back of this lid, or manual before proceeding, OR FOR HELP CALL GLOCK, INC. AT (404) 432–1202. Placing, pushing or forcing the trigger of a loaded pistol against the center post of this container can cause the pistol to fire, causing injury or death. IF YOU ATTEMPT TO STORE A LOADED PISTOL IN THIS CONTAINER, OR PULL THE TRIGGER WITHOUT FIRST FOLLOWING THE UNLOADING PROCEDURES IN THE INSTRUCTION MANUAL, YOU CAN CAUSE INJURY OR DEATH TO YOURSELF OR ANOTHER.

d. **UNLOADING PROCEDURES**

1. Remove magazine by depressing MAGAZINE CATCH.

2. Pull slide back to eject the round which is in the chamber.

3. Check to ensure that there is no round in the chamber.

4. Allow the slide to spring forward by releasing it. Pull the trigger into the full pulled position with weapon pointing in a safe direction.

CAUTION: ALWAYS UNLOAD YOUR PISTOL IMMEDIATELY AFTER USE AND PRIOR TO CLEANING AND STORAGE TO MINIMIZE THE RISK OF ACCIDENTAL DISCHARGE.

e. **WARNING!! DO NOT USE RELOADED OR REMANUFACTURED AMMUNITION!**

(Defs.' Mem. Supp. Mot. Summ. J., Ex. C) (emphasis—capitals and bold—in original;

differences in font size are not replicated here).

## II. *Standard of Review*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In addition, I must view all facts in the light most favorable to the non-moving party. *Woods v. Friction Materials, Inc.,* 30 F.3d 255, 259 (1st Cir.1994). However, the existence of an alleged factual dispute will not defeat a motion for summary judgment unless it is related to genuine issue of material fact. *Thomas v. Digital Equipment Corp.,* 880 F.2d 1486, 1489 (1st Cir.1989) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). "When a party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial, there can no longer be a genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." *Smith v. Stratus Computer, Inc.,* 40 F.3d 11, 12 (1st Cir.1994), *cert. denied,* 514 U.S. 1108, 115 S.Ct. 1958, 131 L.Ed.2d 850 (1995) (citation omitted). Thus, the purpose of summary judgment is to "pierce the pleadings" and determine "whether there is a genuine need for trial." *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990).

5. Wasylow argues that the handgun was negligently designed and unreasonably dangerous because it did not incorporate a manual safety (external device which must be switched off before firing), nor a magazine disconnect (i.e., a device designed to prevent the firearm from discharging when the magazine is not in the firearm).

6. Wasylow is an individual residing in Taunton, Massachusetts. Glock, Inc. is a corporation with its principal place of business in Smyrna, Georgia. Glock Ges.m.b.H. is a foreign corporation with its principal place of business in Deutch–Wagram, Austria. Both Glock corporations regularly transact business in Massachusetts.

## III. *The Causes of Action*

In this diversity action, the parties properly agree that Massachusetts law prevails. The complaint asserts four specific causes of action within the products liability sphere. Wasylow contends that his Glock pistol and storage container (known as a "Glock box") were negligently designed, manufactured, tested, inspected, marketed, and distributed by defendants; that both the pistol and container were unreasonably dangerous; and that both failed to include adequate warnings and instructions.[5] Specifically, Wasylow alleges negligence (Counts I and II), breach of implied warranty of merchantability (Counts III and IV), breach of implied warranty of fitness for a particular purpose (Counts V and VI), and violation of Mass. Gen. L. ch. 93A (Counts VII and VIII).[6] Analytically, these causes of action are distinct yet overlap, and consequently are often confused by the parties as well as in caselaw.[7]

■ First, as to Counts I and II, Wasylow alleges negligence in design, manufacturing, testing, inspection, distribution, marketing, and in failure to warn regarding both the Glock pistol and the storage case. Negligence, in general, requires a duty, breach of duty, cause-in-fact (or "but-for-cause"), and proximate cause (or "legal cause"). "The focus of the negligence inquiry is on the conduct of the defendant. We impose liability when a product's manufacturer or seller has failed to use reasonable care to eliminate foreseeable dangers which subject a user to an unreasonable risk of harm." *Colter v. Barber–Greene Co.,* 403 Mass. 50, 61, 525 N.E.2d 1305 (1988); W. Page Keeton et al.,

This court has jurisdiction under 28 U.S.C. § 1332(a)(i) and (ii). There is complete diversity and the amount in controversy, exclusive of interest and costs, exceeds $50,000.

7. I note that both parties fail to discuss the specific causes of action asserted in the eight counts. Instead, Wasylow concentrates solely on the lack of a manual safety/magazine disconnect as alleged defects, cites no cases (other than four cases for the summary judgment standard), and advances essentially a policy argument. On the other hand, Glock concentrates on the pertinent warnings, repetitively citing failure to warn cases. Neither party identifies the elements of proof nor analyzes the differences among the four causes of action found in the complaint.

*Prosser and Keeton on the Law of Torts* § 96, at 683 (5th ed.1984).

■ Second, Wasylow alleges breach of the implied warranty of merchantability in Counts III and IV. This cause of action stands on a different footing, focusing on the product rather than on the conduct of the manufacturer or the user. *Colter,* 403 Mass. at 61–62, 525 N.E.2d 1305. In Massachusetts, the warranty of merchantability is governed by Mass. Gen. L. ch. 106, § 2–314 which provides, *inter alia,* that goods must be "fit for the ordinary purposes for which such goods are used" and must "conform to the promises or affirmations of fact made on the container or label if any." § 2–314(2)(c) and (f). In turn, Massachusetts warranty law has been interpreted as congruent in nearly all respects with the strict liability principles in the Restatement (Second) of Torts § 402A (1965).[8] *Back v. Wickes Corp.,* 375 Mass. 633, 640, 378 N.E.2d 964 (1978). In other words, although not recognized by name, the Massachusetts products liability claim for breach of the warranty of merchantability "is basically the same as strict liability theory in tort" under Massachusetts law. *Hayes v. Douglas Dynamics,* 8 F.3d 88, 89 n. 1 (1st Cir.1993) (citation omitted). Therefore, a breach of warranty can occur, regardless of negligence, if either 1) the product is defectively designed, or 2) foreseeable users are not adequately warned. *Kearney v. Philip Morris, Inc.,* 916 F.Supp. 61, 64 (D.Mass.1996). As with negligence, Wasylow must also prove that Glock's products were— more likely than not—the cause-in-fact, as well as the proximate cause of the injury. *Id.* at 64, 69; *Hayes,* 8 F.3d at 89; *Lubanski v. Coleco Industries, Inc.,* 929 F.2d 42, 48 (1st Cir.1991).

Third, Wasylow alleges breach of the implied warranty of fitness for a particular purpose in Counts V and VI. This warranty is similar to the warranty of merchantability but more narrowly applies "where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods." Mass. Gen. L. ch. 106, § 2–315. A "particular purpose" differs from the "ordinary purpose" in that it "envisages a specific use by the buyer which is peculiar to the nature of his business." *Id.,* Comment 2.[9]

Fourth, Wasylow alleges a violation of Mass. Gen. L. ch. 93A which declares unlawful unfair methods of competition and unfair or deceptive acts or practices. However, if Wasylow's claims of breach of warranty and negligence fail, the 93A claim fails as well. *Kearney,* 916 F.Supp. at 65.

### A. Negligence in Manufacturing, Inspection, Testing, Distribution and Marketing

■ Wasylow fails to set forth *any* facts to support his claim, as to which he bears the burden of proof, that the Glock pistol and the Glock box were negligently manufactured (*or* inspected, tested, distributed or marketed). In fact, Wasylow testified that he had used the handgun for target shooting on at least two occasions prior to the incident with no malfunction or mechanical problems; Wasylow agreed that it was "fine" and that he liked the "way it handled." (Wasylow Dep. at 125.) Moreover, Wasylow's firearm consultant, Berg, has since test fired the handgun and reported that all functions were normal. (Berg Report at 2, 12.) A defect from manufacturing, as opposed to design, occurs when a product differs from identical products issued from the same manufacturer. *Back,* 375 Mass. at 641, 378 N.E.2d 964. However, the Glock pistol was manufactured

---

**8.** § 402A provides:
   Special Liability of Seller of Product for Physical Harm to User or Consumer.
   (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer. . . .
   (2) The rule stated in Subsection (1) applies although

(3) The seller has exercised all possible care in the preparation and sale of his product. . . .

**9.** For example, a seller may have knowledge that the ordinary purpose of a pair of shoes is for walking, but that the particular purpose for a certain pair of shoes is for climbing mountains. Mass. Gen. L. ch. 106, § 2–315, Comment 2.

exactly as intended, similar to all other "Glock 21" pistols; the same holds true for the Glock box.

Thus, there are no facts by which any reasonable juror could find negligence in the manufacturing and distribution process and thus summary judgment as a matter of law is appropriate.

### B. *Failure to Warn as Negligence and Breach of Warranty*

A manufacturer of a product which the manufacturer "knows or should know is dangerous" is under a duty to give warning of such dangers to persons who foreseeably will come in contact with that product. *MacDonald v. Ortho Pharmaceutical Corp.*, 394 Mass. 131, 135, 475 N.E.2d 65 (1985) (citation omitted). Liability for failure to give such warnings may be imposed even if there is no negligent design or manufacture. *Laaperi v. Sears Roebuck & Co.*, 787 F.2d 726, 729 (1st Cir.1986); *Schaeffer v. General Motors Corp.*, 372 Mass. 171, 173, 360 N.E.2d 1062 (1977). The adequacy of the warning must be "comprehensible to the average user," conveying the danger "to the mind of a reasonably prudent person," *MacDonald*, 394 Mass. at 140, 475 N.E.2d 65, and its forcefulness must be "commensurate with the danger involved." *Wolfe v. Ford Motor Co.*, 6 Mass.App.Ct. 346, 349, 376 N.E.2d 143 (1978). If an adequate warning is supplied, under Massachusetts law there is a presumption that it will be read. *Knowlton v. Deseret Medical, Inc.*, 930 F.2d 116, 123 (1st Cir. 1991). However, as with all negligence allegations, failure to warn will not constitute negligence if it is not the proximate cause of the plaintiff's injuries. *Laaperi*, 787 F.2d at 729.

Wasylow argues that "the instructions and warnings provided with the Glock pistol were inadequate and dangerous," (Jt.

Pre–Trial Mem. at 1), and that "the Glock box warning provided by the Defendant are [sic] both dangerous, inadequate, and arrogantly used in the face of known hazards." (Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. at 2.) However, given the quantitative and qualitative extent of the warnings as outlined above, I find such assertions not only insupportable but frivolous.[10]

For his part, Wasylow has admitted:

-seeing, but not reading the warnings on the Glock box; (Wasylow Dep. at 175, 240)

-intentionally never reading the Instructions manual *or* the Basic Rules booklet; (Wasylow Dep. at 86, 130, 250)

-never reading product literature in general, except when he needs to program his VCR; (Wasylow Dep. at 89)

-knowing the gun did not have a manual safety; (Wasylow Dep. at 106–7)

-that upon reading the Instructions manual and other warnings—e.g., the admonitions: 1) always to check the chamber and 2) never to point the gun at anything you do not want to shoot—he understood the instructions and warnings; that he is able to follow the instructions and warnings; that they are good safety rules; *and that if he had followed the instructions and warnings the accident would not have occurred.* (Wasylow Dep. at 243–44, 250–56)

-not paying much attention in his four-hour firearm safety class; (Wasylow Dep. at 202).

Thus, although I recognize that the adequacy of warnings is "almost always an issue to be resolved by a jury," *MacDonald*, 394 Mass. at 140, 475 N.E.2d 65, I find that given the facts before me—especially Wasylow's admissions—no reasonable juror could find a failure to warn. Moreover, Wasylow's deliberate indifference to the warnings con-

---

**10.** I am inclined to believe the warnings were greater than were required given the obviousness, as a matter of law, of the dangers inherent in guns. *See generally Laaperi v. Sears Roebuck & Co.*, 787 F.2d 726, 730–32 (1st Cir.1986). For example, a manufacturer is not required to warn that "placing one's hand into the blades of a potato chopper will cause injury" or that "firing a BB gun at another at close range can injure or kill." *Id.* at 731 (citations omitted). I find warnings such as "do not point a weapon at anything you do not want to shoot" and "always check to make sure there is no bullet in the chamber" to be similar. "If a manufacturer had to warn consumers against every such obvious danger inherent in a product, 'the list of obvious practices warned against would be so long, it would fill a volume.'" *Id.* (citation omitted).

stituted the cause-in-fact as well as the proximate cause of his injuries.

For the same reasons, I find no implied breach of warranty for failure to warn.

## C. *Design Defects*

■■■■■ Wasylow's complaint, although obscure, appears to assert both negligent design and defective design as a breach of warranty regarding both the Glock pistol (given no manual safety or magazine disconnect) and the Glock box (given that the trigger may be pushed before fitting the pistol in the box). In a negligence action, Wasylow has the burden to show that the manufacturer failed to exercise reasonable care to eliminate avoidable or foreseeable dangers to the user, *Uloth v. City Tank Corp.*, 376 Mass. 874, 880–81, 384 N.E.2d 1188 (1978), but there is no duty to design a product that is "risk free" or "risk proof." *Morrell v. Precise Engineering, Inc.*, 36 Mass.App.Ct. 935, 936, 630 N.E.2d 291 (1994) (citation omitted). "[T]here is a case for the jury if the plaintiff can show an available design modification which would reduce the risk without undue cost or interference with the performance of the machinery." *Uloth*, 376 Mass. at 881, 384 N.E.2d 1188.[11]

■■■■■ Alternatively, in order to prove defective design as a breach of warranty, Wasylow need not prove negligence, but must prove that the design was not "fit" for ordinary usage because of a defect making it "unreasonably dangerous." *Colter*, 403 Mass. at 61–62, 525 N.E.2d 1305.[12]

Under either theory, the defect must have proximately caused the injuries. *Lubanski*, 929 F.2d at 48.

■■■■■ I find no merit in Wasylow's defective design claims. First, I cannot find that a reasonable juror could conclude that it was foreseeable to Glock that, *despite all warnings*, a user would nevertheless fail to check the chamber and proceed to pull the trigger while pointing the gun at his own stomach, and, consequently, that a different design would be required. Thus, the element of proximate cause is lacking.[13]

■■■■■ Second, I note that while an alternative design for the Glock pistol (incorporating a manual safety or magazine disconnect), or for the Glock box (allowing for loaded storage) is economically feasible, the functional purpose of both products would be altered. Glock intentionally designed the Glock 21 pistol, a semi-automatic weapon, without a manual safety or magazine disconnect to allow "the best possibility [for] getting off a shot quickly and without having to operate external safety devices."[14] (Instructions manual at 5.) Similarly, the lack of a magazine disconnect allows for firing, if necessary, while in the process of loading or reloading. (Jt. Pre–Trial Mem. at 3.) Thus, unlike, for example, automobile airbags, manual safeties and magazine disconnects affect the *functional capabilities* and not just the

**11.** Massachusetts law further holds that:

> In evaluating the adequacy of a product's design, the jury should consider, among other factors, 'the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.' *Back v. Wickes Corp.*, 375 Mass. 633, 642, 378 N.E.2d 964 (1978) (citation omitted).

**12.** By contrast, a product is "reasonably fit" if the design avoids the "reasonably foreseeable risks attending the product's use.... " *Back*, 375 Mass. at 640–41, 378 N.E.2d 964. For example, the risk that a vehicle may collide with a guardrail is foreseeable, but the risk that a user

may drive 100 m.p.h. and crash head-on is not. *Id.*

**13.** I note Massachusetts' comparative negligence statute, Mass. Gen. L. ch. 231, § 85, applicable to negligence actions but not to breach of warranty actions, *Correia v. Firestone Tire & Rubber Co.*, 388 Mass. 342, 446 N.E.2d 1033 (1983), but conclude that any reasonable juror would find Wasylow *more* than fifty percent responsible, thus barring all recovery. *Colter v. Barber–Greene Co.*, 403 Mass. 50, 62–63, 525 N.E.2d 1305 (1988).

**14.** Instead, the Glock 21 features three other safeties which function automatically: (1) the trigger safety (external); (2) the firing pin safety (internal); and (3) the drop safety (internal). (Instructions manual at 17; Jt. Pre–Trial Mem. at 2.)

*safety* of the respective products.[15] *See also DeRosa v. Remington Arms Co., Inc.,* 509 F.Supp. 762, 768 (E.D.N.Y.1981) (finding light trigger tension, with inexpensive alternatives available, not design defect due to its functional purpose).

Third, even if, *arguendo,* the lack of either a manual safety or magazine disconnect constitutes a defect, Wasylow had *full knowledge of such defects* (Wasylow Dep. at 106–7), and "a plaintiff's knowing and unreasonable use of a defective product is an affirmative defense to a defendant's breach of warranty." *Colter,* 403 Mass. at 60, 525 N.E.2d 1305 (citing *Correia v. Firestone Tire & Rubber Co.,* 388 Mass. 342, 446 N.E.2d 1033 (1983)); *see also Knowlton,* 930 F.2d at 120.[16]

Finally, carelessness and misuse cannot transform an obviously—and inherently—dangerous product into a defective, and "unreasonably dangerous" product. Thus, under Massachusetts law:

> Toothpicks, like pencils, pins, needles, knives, razor blades, nails, tools of most kinds, bottles and other objects made of glass, present obvious dangers to users, but they are not unreasonably dangerous, in part because the very obviousness of the danger puts the user on notice. It is foreseeable that some will be careless in using such items and will be injured, but the policy of our law in such cases is not to shift the loss from the careless user to a blameless manufacturer or supplier.

*Killeen v. Harmon Grain Products, Inc.,* 11 Mass.App.Ct. 20, 23, 413 N.E.2d 767 (1980). *See also Kearney,* 916 F.Supp. at 72 (discussing authoritative value of *Killeen* in light of *Back* and *Uloth* ); *Mavilia v. Stoeger Industries,* 574 F.Supp. 107, 111 (D.Mass.1983)

("[T]hat death may result from careless handling of firearms is known by all Americans from an early age"). In other words, Wasylow's misuse of the product, as undeniably established on this record, has been shown as a matter of law to be the proximate cause of his injuries.

The question of fitness for ordinary purposes "is largely one centering around reasonable consumer expectations." *Venezia v. Miller Brewing Co.,* 626 F.2d 188, 190 (1st Cir.1980). Here, the Glock pistol and Glock box were exactly what they were represented to be, "neither more nor less, with no hidden dangers or unpredictable propensities," *Killeen,* 11 Mass.App.Ct. at 23, 413 N.E.2d 767, and would fulfill any reasonable consumer's expectations. Thus, I find that Wasylow's design defect claims, whether grounded in negligence or breach of warranty, fail.[17]

Prescinding from the precise elements of Massachusetts law of products liability, Wasylow presses a normative argument advocating absolute liability: that the Glock 21 pistol, without a manual safety or magazine disconnect, is unreasonably dangerous as a matter of social policy, regardless of 1) the existence or extent of warnings, 2) Wasylow's failure to read the warnings, 3) the obviousness of the danger, or 4) Glock's intention to design the pistol specifically *without* the manual safety or magazine disconnect. I decline to embrace such an argument.

It is the province of legislative or authorized administrative bodies, and not the judicial branch, to advance through democratic channels policies that would directly or indirectly either 1) ban some classes of handguns or 2) transform firearm enterprises into in-

---

**15.** As for the Glock box, the present design and accompanying warnings, in fact, appear to address safety considerations by preventing *loaded* storage. I note that Wasylow has presented no safer, alternative designs—apart from the manual safety and magazine disconnect contentions—for the storage case itself. That is an element which is required in a design defect case. *Kotler v. American Tobacco Co.,* 926 F.2d 1217, 1225 (1st Cir.1990).

**16.** Unlike comparative negligence, a user's unreasonable use of an obviously dangerous product *completely bars* recovery in a breach of warranty action. *Correia v. Firestone Tire & Rubber Co.,* 388 Mass. 342, 356, 446 N.E.2d 1033 (1983).

**17.** *But see LeMaster v. Glock, Inc.,* 610 So.2d 1336, 1339 (Fla.App. 1 Dist.1992) (finding genuine issue of material fact existed whether lack of manual safety constituted defect where police officer accidentally fired at suspect).

surers against misuse of their products.[18] Frustration at the failure of legislatures to enact laws sufficient to curb handgun injuries is not adequate reason to engage the judicial forum in efforts to implement a broad policy change. The reporters for the developing draft American Law Institute RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY have noted that:

> common and widely distributed products such as alcoholic beverages, tobacco, firearms, and above-ground swimming pools may be found to be defective only upon proof of the [standard elements of products liability claims discussed above].... Absent proof of defect under [such legal principles], however, courts do not impose liability based on a conclusion that an entire product category should not have been distributed in the first instance. That is, courts have not imposed liability for categories of products that are generally available and widely used and consumed, solely on the ground that they are considered socially undesirable by some segments of society. Instead, courts have concluded that the issue is better suited to resolution by legislatures and administrative agencies that can more appropriately consider whether distribution of such product categories should be prohibited.[19]

§ 2 at c at 21 (Tort. Draft No. 2, 1995).

I find in this case, that as a matter of law Glock is entitled to summary judgment on all claims relating to defective or "inherently dangerous" design.[20]

---

**18.** It is similarly not the function of a jury to make and enforce such policy in individual cases. Regardless of Back's discussion on the proper factors for a jury to consider in design defect cases, see above n. 11, the Supreme Judicial Court of Massachusetts has not "totally surrendered to the jury the function of all policy-weighing on which the scope and limits of product design liability depend." *Kearney v. Philip Morris, Inc.*, 916 F.Supp. 61, 70 (D.Mass.1996).

**19.** I note that, to date, the majority of courts, both state and federal, have rejected the argument that manufacturers should be held absolutely liable for injuries—whether from accidents or criminal misuse—caused by guns. This includes claims based on the lack of manual safeties, distribution policies, the manufacture of inexpensive "Saturday Night Specials," or solely for manufacture of a dangerous product. Because guns are inherently ultrahazardous—designed to kill or wound—there is no safer alternative but elimination of the products altogether. This task, courts have routinely found, is not appropriate for the judiciary. *See*, under Massachusetts law, *Mavilia v. Stoeger Industries*, 574 F.Supp. 107 (D.Mass.1983). *See also Shipman v. Jennings Firearms, Inc.*, 791 F.2d 1532 (11th Cir.1986); *Perkins v. F.I.E. Corp.*, 762 F.2d 1250 (5th Cir.1985); *Martin v. Harrington and Richardson, Inc.*, 743 F.2d 1200 (7th Cir.1984); *Armijo v. Ex Cam, Inc.*, 656 F.Supp. 771 (D.N.M. 1987), *aff'd*, 843 F.2d 406 (10th Cir.1988); *Delahanty v. Hinckley*, 686 F.Supp. 920 (D.D.C.1986), *aff'd*, 900 F.2d 368 (D.C.Cir.1990); *Patterson v. Rohm Gesellschaft*, 608 F.Supp. 1206 (N.D.Tex. 1985); *Riordan v. International Armament Corp.*, 132 Ill.App.3d 642, 87 Ill.Dec. 765, 477 N.E.2d 1293 (1985); *Rhodes v. R.G. Industries, Inc.*, 173 Ga.App. 51, 325 S.E.2d 465 (1984). *See generally* Note, *Handguns and Products Liability*, 97 Harv. L.Rev.1912 (1984); Donald E. Santarelli and Nicholas E. Calio, *Turning the Gun on Tort Law: Aiming at Courts to Take Products Liability to the Limit*, 14 St. Mary's L.J. 471 (1983).

In fact, other than *Kelley v. R.G. Industries, Inc.*, 304 Md. 124, 497 A.2d 1143 (1985) (finding manufacturer strictly liable for "Saturday Night Special"), the contrary position has been advanced exclusively by law journal articles, which I note, but decline to follow. These articles argue that the manufacturing of handguns should be classified as an ultrahazardous activity, and the cost of handgun injuries should be imposed on the manufacturers, with the anticipated effect of dampening the market for their sales. *See, e.g.*, Carl T. Bogus, *Pistols, Politics and Products Liability*, 59 U. Cinn. L.Rev. 1103 (1991); Andrew O. Smith, *The Manufacture and Distribution of Handguns as an Abnormally Dangerous Activity*, 54 U. Chi. L.Rev. 369 (1987); Paul R. Bonney, *Manufactures' Strict Liability for Handgun Injuries: An Economic Analysis*, 73 Geo. L.J. 1437 (1985); H. Todd Iveson, *Manufacturers' Liability to Victims of Handgun Crime: A Common–Law Approach*, 51 Fordham L.Rev. 771 (1983); Gerard M. Mackarevich, *Manufacturers' Strict Liability for Injuries from a Well–Made Handgun*, 24 Wm. & Mary L.Rev. 467 (1983).

**20.** I need not conclusively determine the issue of the admissibility of the "expert" report (in non-affidavit form) submitted by Wasylow's firearm consultant, Stephen O. Berg. Rule 702 of the Federal Rules of Evidence requires that the testimony be from a qualified witness who will "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. *See generally United States v. Shay*, 57 F.3d 126, 133 (1st Cir.1995) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)); *In re Paoli Railroad Yard PCB*, 35 F.3d 717, 741–52 (3d Cir. 1994), *cert. denied*, 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995).

### D. *Breach of the Implied Warranty of Fitness for a Particular Purpose*

Because Wasylow has proffered no evidence to support his claim for breach of warranty for a particular purpose, the claim fails for the same reasons underlying the warranty of merchantability or "ordinary purpose." In fact, it was Glock who designed the Glock 21 pistol with a more narrow purpose in mind, thereby incorporating semi-automatic features. Wasylow cannot advance any particular purpose on which he relied, and for which the pistol was not "fit."

### E. *Mass. Gen. L. ch. 93A*

Because Wasylow has advanced no facts in support of his ch. 93A claim, other than the facts underlying his warranty and negligence claims, the ch. 93A claim also fails. *Kearney,* 916 F.Supp. at 65.

### IV. *Conclusion*

For the reasons set forth more fully above, Glock's motion for summary judgement, on all counts, is GRANTED.

The Berg report establishes several propositions: 1) that an alternative pistol design which incorporates a manual safety and/or magazine disconnect is feasible, 2) the historical emergence of the manual safety (dating back to the Holy Roman Emperor Maximilian I in the fifteenth century), 3) that semi-automatic weapons are more dangerous than double action revolvers, necessitating the need for manual safeties, 4) that semi-automatic weapons have, in the past, incorporated manual safeties, 5) that another Glock model incorporates a manual safety, and 6) that in Berg's opinion, the lack of a manual safety, as well as a magazine disconnect, are design defects.

Glock does not contest any of these propositions, apart from Berg's conclusion. I do not find Berg's conclusion to be based on any particular scientific qualifications; rather it expresses what is essentially a preference for the advantages of additional safety devices. Nevertheless, despite its apparent disabilities and unsworn character, I have considered Berg's report in evaluating whether summary judgment should be allowed. I do not find its conclusory historical and policy based observations sufficient to overcome the shortcomings in plaintiff's proof. It is barely relevant to the material issues, particularly the fundamental issue of causation. Moreover, as other courts have observed, Berg lacks the specialized scientific qualifications to justify admitting his testimony as expertise under Fed. R.Evid. 702. I consider it likely that I would not permit Berg to testify even if this case were to survive the instant summary judgment motion. But even considering Berg's observation in connection with this motion, I find no basis to conclude that Glock's motion for summary judgment is anything other than well-founded.