**LIVINGSTONE FLOMEH–MAWUTOR, et al., Plaintiffs,**

v.

**BANKNORTH, N.A., Defendant.**

No. CIV.A. 02–40157NMG.

United States District Court, D. Massachusetts.

Dec. 17, 2004.

Johnathan R. Elliott, Sr., Attorney at Law, Springfield, MA, W. Theodore Harris, Jr., Ted Harris and Associates, P.C., Worcester, MA, for Plaintiffs.

Osamwonyi E. Osagiede, Law Offices of Sam Osagiede & Assoc., Dorchester, MA, for Livingstone Mawutor, Joseph Kotoch, Free Horizon, LLC, Counter Defendants.

Jonathan Shapiro, Moon, Moss, McGill, Hayes & Shapiro, Matthew Tarasevich, Moon, Moss, McGill & Shapiro, P.A., Port-

land, ME, for BankNorth, N.A., Counter Claimant.

## MEMORANDUM & ORDER

GORTON, District Judge.

Plaintiffs Livingstone Flomeh–Mawutor ("Mawutor") and Joseph Kotoch ("Kotoch") (together, "plaintiffs"), doing business as Free Horizon, bring this case against defendant Banknorth, N.A. ("Banknorth" or "the Bank"), alleging fraud with respect to defendant's denial of plaintiffs' request for a small business loan. This Court's jurisdiction is based on diversity because plaintiffs reside in Massachusetts, defendant is a banking institution registered under the laws and having its principal place of business in the State of Maine and the amount in controversy exceeds $75,000.

## I. *Background*

### A. **Factual Background**

In early 2000, plaintiffs operated a relatively new company, Free Horizon, which was based in Fitchburg, Massachusetts. Free Horizon's business was to purchase "recycled clothing" (e.g. end of season new clothing and used clothing) and export the clothing to Ghana, where it would be sold for a profit.

On February 18, 2000, Robert Guertin ("Guertin"), Vice President and Loan Officer at Banknorth's Gardner, Massachusetts branch office, met with Mawutor and Kotoch to discuss their interest in applying for a loan for Free Horizon under the Small Business Administration ("SBA") Low DocLoan Guaranty Program. Guertin and plaintiffs discussed Free Horizon's business and the process for applying for an SBA-guaranteed loan.

Export credit insurance is available from the Export–Import Bank of the United States ("Ex–Im Bank") and certain other sources. Such insurance is used to protect an exporting company, such as Free Horizon, against non-payment or default by foreign buyers. Plaintiffs assert and defendant disputes that, at the February 18, 2000, meeting they explained to Guertin that they did not qualify for export credit insurance but it is undisputed that at that meeting plaintiffs provided Guertin with a copy of their business plan which states "Free–Horizon will obtain Export Credit Insurance on purchase."

Plaintiffs and Guertin had originally contemplated a loan in the amount of $150,000, the maximum allowable SBA LowDoc loan. In April, 2000, after reviewing financial information submitted by plaintiffs, Guertin determined that Free Horizon would require more financing and should apply for two separate SBA-guaranteed loans: a $135,000 line of credit ("LOC") and a $64,000 equipment loan. Guertin suggested that the $135,000 LOC be submitted under the Export Working Capital Program ("EWCP"), a program designed to support export financing to small businesses. EWCP is a combined effort of the SBA and the Ex–Im Bank.

By letter dated June 29, 2000, SBA notified the Bank that it had conditionally approved plaintiffs' $135,000 LOC under the SBA Guaranty Loan Program. Enclosed with the letter was SBA's Authorization and Loan Agreement for the $135,000 LOC ("the Loan Authorization"), which set forth the conditions upon which SBA had approved the loan guarantee. The Loan Authorization specifically required that the borrower have and maintain Ex–Im Bank credit insurance and that the borrower assign all claim proceeds to SBA and/or designate SBA as the lender and loss payee under the policy.

The Bank prepared a commitment agreement dated July 5, 2000, and a re-

vised commitment agreement dated July 13, 2000, ("the RCA") for the $135,000 LOC. The RCA stated:

> We are pleased to inform you that your application has been approved on the following terms and conditions. The Bank's commitment is further subject to the issuance of final agreement by the [SBA] to guaranty 90% of the loan amount and issuance by the SBA of its final Authorization and Loan Agreement. Additionally, the Bank's commitment shall be subject to all the terms and conditions of the final SBA Authorization and Loan Agreement.

One of the conditions set forth in the RCA was that at closing the borrower was to deliver to the Bank "satisfactory insurance certificates" naming the Bank, its successors and assigns as loss payee with respect to the borrower's personal property assets. The RCA also stated:

> Borrower should not rely on this commitment for the purpose of committing funds or assuming other liability until both final documentation is executed and any remaining credit or financial contingencies in this agreement have been fully completed to the Bank's satisfaction.... After acceptance, should the loan not be closed in accordance with all the terms and conditions specified above within...45 days from the date of this letter, approval of the loan may be voided at the option of the Bank.

Mawutor and Kotoch accepted the RCA by signing it, individually and as officers of Free Horizon, on July 14, 2000.

On or about July 21, 2004, Guertin and John Joyce ("Joyce") at the SBA learned or confirmed that plaintiffs would not qualify for Ex–Im Bank credit insurance because Free Horizon was a start-up company and had not been in business for one year. By this time Mawutor was also aware that Free Horizon did not qualify

for Ex–Im Bank credit insurance. Guertin and defendant discussed the possibility of plaintiffs obtaining irrevocable letters of credit from their customers in lieu of export credit insurance, but this option was not pursued. Thereafter, by letter dated July 26, 2000, Guertin withdrew the loan applications that the Bank had submitted to SBA on behalf of plaintiffs, stating that the reason was that plaintiffs were unable to obtain export credit insurance. On July 27, 2000, Guertin informed plaintiffs in person that the Bank was unable to approve their pending loan applications and he confirmed that by letter dated August 9, 2000.

Plaintiffs appealed the Bank's denial of their loans to the Small Business Loan Review Board, which determined that the Bank had denied their loans for a valid reason. Plaintiffs then filed a complaint against the Bank with the Massachusetts Commission Against Discrimination ("MCAD") alleging that their loan requests were denied because of discrimination based on race, color or national origin. MCAD investigated plaintiffs' claims and rejected them as unfounded.

Plaintiffs assert that throughout the process, Guertin had assured them that it was highly likely that they would qualify for the loans and that they made business decisions in reliance on his statements. They claim that because of his assurances they entered into a seven-year warehouse lease, used their personal credit cards to pay for business expenses and entered into agreements with overseas customers. Plaintiffs contend that they suffered actual losses from merchandise purchased, goods shipped, warehouse charges and lost export revenue in excess of $140 million. An amended statement of damages filed in state court, with respect to the Consumer Protection Act claim only, demanded more than $332 million from Banknorth as com-

pensation for the Bank's refusal to grant them loans in the amount of $199,000.

## B. Procedural History

Plaintiffs filed the instant suit in state court on May 9, 2002. The original complaint contained a count for unfair and deceptive business practices in violation of M.G.L. c. 93A (Count I) and a count for discrimination based on race or color in violation of M.G.L. c. 151B (Count II). Plaintiffs amended their complaint once to change the name of the defendant from First Mass. Bank, N.A. to Banknorth, N.A. and to amend their statement of damages. On or about August 21, 2002, Plaintiffs amended their complaint a second time, dropping Count II for racial discrimination.

On August 27, 2002, defendant timely removed the action to this Court. Between June, 2003 and October, 2003, plaintiffs moved to amend their complaint three more times. On March 17, 2004, the Court (Swartwood, M.J.) denied two of the proposed amendments but allowed one which sought to add a claim of common law fraud against Banknorth. Plaintiffs filed a third amended complaint on March 23, 2004, but it contained allegations different from those that had been presented in the proposed amendment that the Court had allowed. This Court struck plaintiffs' most recent complaint and ordered them to re-file it in such a form as to comply with the motion to amend that had been allowed. On April 2, 2004, plaintiffs so filed.

On April 15, 2004, defendant filed counterclaims against plaintiffs, alleging intentional misrepresentation or deceit (Count I), negligent misrepresentation (Count II), unfair or deceptive practices in violation of M.G.L. c. 93A (Count III) and abuse of process in violation of M.G.L. c. 93A (Count IV). The same day defendant moved for summary judgment on plaintiffs' complaint.

## II. *Analysis*

### A. Summary Judgment Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir.1991)(quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990)). The burden is upon the moving party to show, based upon the pleadings, discovery and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A *genuine* issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir.1993). If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law, summary judgment is appropriate.

## B. Fraud Claim

■ To prevail on their common law fraud claim, plaintiffs must prove that 1) an agent of the Banknorth made a false representation of a material fact, 2) with knowledge of its falsity, 3) for the purpose of inducing plaintiffs to act thereon, and 4) plaintiffs relied upon the representation as true and acted upon it to their detriment. See *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 322 N.E.2d 768, 779 (1975).

Plaintiffs' case is based upon various allegedly fraudulent statements made by Guertin, an agent of the Bank. The statements can be divided into those made before July 26, 2000, the date on which defendant withdrew the loan applications to SBA, and those made on or after July 26, 2000. As explained more fully below, statements in the former category were admittedly not false and statements in the latter category did not induce detrimental reliance. Neither category, therefore, contains statements that can be considered fraudulent.

### 1. Statements made before July 26, 2000

■ Plaintiffs' April 2, 2004 amended complaint describes numerous instances of plaintiffs' detrimental reliance on statements made by Guertin but it does not allege that any of the statements made by Guertin was false. Furthermore, at his deposition, on March 16, 2004, Mawutor confirmed several times that everything Guertin told him throughout the loan application process was true. The questions posed to Mawutor and his answers were as follows:

Q: So based upon what you're telling me here it sounds like right up until the very end everything Mr. Guertin told you was true?

A: Yes, definitely.

\* \* \* \* \* \*

Q: [U]p until ... July 26, 2000, Bob Guertin was working very hard for Free Horizon to get this loan, wasn't he?

A: That's correct.

Q: And everything that he told you up to that point as far as you know was true, correct?

A: That's correct.

No matter how much detrimental reliance plaintiffs allege, an essential element of all fraud claims, i.e. a false statement, is missing. If Guertin made no false statements, plaintiffs cannot recover for fraud.

Plaintiffs argue for the first time in their memorandum in opposition to summary judgment that Guertin had no intention of allowing plaintiffs to fulfill the terms and conditions of the RCA. Because Mawutor admitted that Guertin made no false statements during the course of the loan application process, that argument is logically inconsistent insofar as it relates to the intentions of defendant prior to July 26, 2000.

### 2. Statements made on or after July 26, 2000

■ Plaintiffs have not alleged nor submitted any evidence with respect to detrimental reliance based on statements made on or after July 26, 2000. Indeed, it would be difficult to prove such reliance because plaintiffs were notified unequivocally and in person on July 27, 2000, that Banknorth would deny their loan applications.

Plaintiffs have submitted an unsigned "draft copy" of a letter dated July 26, 2000, from Guertin to Free Horizon, which purports to confirm that the Bank has been working on Free Horizon's loan request and states that the Bank is then working with a third party to secure a $150,000

loan for the company. The draft copy is not on letterhead, is unsigned and was not authenticated, so it may not properly be considered on summary judgment. Moreover, even if it had been properly authenticated, it would not support a fraud claim because plaintiffs have not alleged that 1) the letter contained any false statements of material fact, 2) Guertin had knowledge of the falsity, 3) Guertin intended that plaintiffs rely on it or 4) plaintiffs did, in fact, rely on it to their detriment.

Plaintiffs argue for the first time in their opposition memorandum that Guertin made false statements regarding the reason for terminating plaintiffs' applications. They claim that, in addition to denying the applications because of plaintiffs' inability to obtain export credit insurance, the Bank did so because of 1) the magnitude of expenses that were immediately due and payable and 2) the minimal collateral available to secure the loans. Plaintiffs note that on the Statement of Credit Denial form sent to them after the loan was terminated, the boxes for the above-stated reasons were not checked off but, rather, the "other" box, with an explanation that "[t]he borrower was unable to obtain Eximbank Insurance as required in the SBA Loan Authorization."

Plaintiffs are grasping at straws to construe the subject statement as constituting fraud. The claim that the Bank's failure to identify on the denial form every factor that contributed to the Bank's rejection of the loan constitutes a false statement is ludicrous. Furthermore, even if the Bank's failure to check the appropriate boxes were construed to be a "false statement", plaintiffs have not alleged, much less offered to prove, that the Bank intended plaintiffs to rely on those statements or that plaintiffs did rely on them to their detriment. Thus, the Bank's failure to check the subject boxes is insufficient to support a claim of fraud.

Plaintiffs also allege that Guertin made false statements relating to the willingness of the SBA and the Bank to accept irrevocable letters of credit from plaintiffs' customers in lieu of the required export credit insurance. Because Mawutor admitted that Guertin made no false statements during the course of the loan application process, the alleged fraud would have to relate to false statements made after the denial of the loan applications. As noted above, plaintiffs have not alleged, nor offered to prove, detrimental reliance on statements relating to the circumstances surrounding the denial of their loan applications after they were denied. Therefore, that mode of attack also fails.

 In plaintiffs' memorandum in opposition to defendant's motion for summary judgment, they argue, for the first time, that defendant breached the RCA. They claim the Bank did so by withdrawing its SBA application on behalf of plaintiffs and by denying the loan application 12 days after plaintiffs' acceptance of the RCA, contending that the RCA "gave the Plaintiffs 45 days [from the date of the RCA] in which to fulfill the terms and conditions of the agreement." Plaintiffs, however, misconstrue the unambiguous language of the RCA. That agreement did not state that the Bank would keep the loan application open for 45 days even if it determined that plaintiffs would be unable to meet the requirements of the Bank or the SBA. The Bank merely informed plaintiffs that it was authorized to terminate their application if plaintiffs did not meet the conditions within 45 days. In any event, plaintiffs have not brought a claim for breach of contract nor suggested how the Bank's July 26 denial of their loan applications could constitute fraud, so their argument of a breach of the RCA is without merit.

It is clear from the pleadings that the loan applications were denied because the plaintiffs failed to obtain export credit insurance which was a prerequisite imposed by the SBA, an agency whose approval plaintiffs knew the Bank required. Plaintiffs do not dispute that they were unable to obtain the required insurance. Their pleadings have failed to show any factual circumstances from which a jury could find all of the elements of a claim for common law fraud, notwithstanding their vigorous attempts to identify false statements allegedly made by Guertin. Accordingly, defendant is entitled to summary judgment on the fraud count.

## C. Chapter 93A Claim

█ Plaintiffs' original complaint and early amended complaints contained a count alleging the violation of the Consumer Protection Act (M.G.L. c. 93A). Plaintiffs' final amended complaint, which they filed with leave of court on April 2, 2004, does not, however, contain a Chapter 93A claim, nor did it incorporate by reference any earlier complaint or claims.[1] Defendant persuasively argues that the Chapter 93A claim has, therefore, been waived.

█ Even if the Chapter 93A claim were properly before the Court, however, it would fail because plaintiffs have alleged no facts to support the contention that Banknorth committed unfair or deceptive trade practices other than those relating to their fraud claim and to Banknorth's alleged breach of the RCA. As explained above, summary judgment will be entered with respect to those claims for the rea-

sons set forth. *See, e.g., Macoviak v. Chase,* 40 Mass.App.Ct. 755, 667 N.E.2d 900, 904 (1996) (holding that summary judgment on Chapter 93A claim is appropriate when summary judgment is granted on fraud claim and Chapter 93A claim is solely based on the underlying claim for common law fraud); *Wasylow v. Glock, Inc.,* 975 F.Supp. 370, 382 (D.Mass.1996)(granting summary judgment on Chapter 93A claim when summary judgment is appropriate on underlying claims and plaintiffs have alleged no additional facts in support of his Chapter 93A claim). Moreover, based on the facts alleged, as viewed in a light most favorable to the plaintiffs, no reasonable jury could find that the Bank's alleged unfair or deceptive acts or practices attained "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." *Levings v. Forbes & Wallace, Inc.,* 8 Mass.App.Ct. 498, 396 N.E.2d 149, 153 (1979).

For these reasons, to the extent plaintiffs have alleged a claim under M.G.L. c. 93A, summary judgment for defendant is warranted.

## D. Motion to Strike

Defendant has moved to strike all of plaintiffs' filings in opposition to summary judgment because they were not properly filed or served. In the alternative, defendant moves to strike numerous paragraphs and exhibits from plaintiffs' statement of material facts because 1) they rely on a pleading which is not part of the record

---

1. Plaintiffs' memorandum in opposition to summary judgment calls defendant's contention that plaintiffs have abandoned their Chapter 93A claim "pure nonsense" and quotes language that plaintiffs identify as being contained in the most recent amended complaint that "Plaintiffs repeat and reassert the allegations contained in...their original complaint...and incorporate those paragraphs by reference." Although that language was in the amended complaint that plaintiffs filed on March 23, 2004 and this Court struck the following week, the succeeding amended complaint filed on April 2, 2004, which is the operative complaint in this case, contains no such language.

and has, in fact, been stricken by this Court, 2) they are not authenticated, supported by affidavit or referenced by a proper citation to the record, and 3) an exhibit that purports to be handwritten notes by Guertin has been significantly altered.[2] The motion is unopposed. Although the allegations contained in the motion appear to be correct, summary judgment is appropriate even considering defendant's filings, so the motion will be denied as moot.

### ORDER

In accordance with the foregoing memorandum,

1. Defendant's Motion to Strike and Motion for Leave to File a Reply Brief (Docket No. 59) is **ALLOWED** to the extent it seeks to file the incorporated reply memorandum, but is **DENIED** to the extent it seeks to strike pleadings submitted by plaintiffs;

2. Defendant's Supplemental Motion to Strike Portions of Plaintiffs' Statement of Material Facts (Docket No. 61) is **DENIED**; and

3. Defendant's Motion for Summary Judgment on Plaintiffs' Amended Complaint (Docket No. 49) is **ALLOWED**.

Because neither party has moved for summary judgment with respect to the counterclaims asserted by defendant against plaintiffs, those claims remain pending.

A status conference in that regard will be held on Thursday, January 13, 2005, at 3:00 p.m.

Plaintiffs have apparently been filing their pleadings without a certificate of service (in violation of Local Rule 5.2(b)) and serving them on defendant after such filing (in violation of Fed.R.Civ.P. 5 and the same Local Rule) and only after numerous requests from defendant and the Clerk's Office. Therefore, plaintiffs are directed to serve and file *all* future pleadings properly and in accordance with the cited rules. Filings that are improperly served and filed will not be considered by this Court and/or may result in the imposition of sanctions.

**So ordered.**

---

2. Defendant's allegations with respect to the presentation to the Court by plaintiffs' counsel of an altered exhibit are cause for serious concern. If defendant or its attorneys believe that an attorney has breached professional or ethical standards, the matter should be brought to the attention of the Massachusetts Board of Bar Overseers for its disposition.