Joao DeMEDEIROS, Plaintiff, Appellant,

v.

KOEHRING CO., et al., Defendants,
Appellees,

v.

PARKER BROTHERS CO., Third-Party
Defendant, Appellee.

Joao DeMEDEIROS, et al.,
Plaintiffs, Appellees,

v.

KOEHRING CO., et al., Defendants,
Appellants,

v.

PARKER BROTHERS CO., Third-Party
Defendant, Appellee.

Nos. 82–1542, 82–1543.

United States Court of Appeals,
First Circuit.

Argued Jan. 5, 1983.
Decided June 1, 1983.

Robert W. Cornell, Boston, Mass., with whom Cornell & Gollub, Boston, Mass., was on brief, for Koehring Co., et al.

Jeffrey S. Stern, Boston, Mass., with whom Tina M. Traficanti, and Sugarman, Rogers, Barshak & Cohen, Boston, Mass., were on brief, for Joao DeMedeiros, et al.

Francis L. Swift, Boston, Mass., for Parker Brothers Co.

Before COFFIN, Chief Judge,* CAMPBELL and BREYER, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.**

Joao DeMedeiros, while working at a factory in Massachusetts, suffered the amputation of portions of three fingers of his right hand as he was attempting to clear a jammed machine. Alleging that the machine, a model 2025 thermoformer manufactured by Brown Machine Company ("Brown"),[1] had been negligently designed, Joao and his wife, Maria, brought this diversity suit in the United States District Court for the District of Massachusetts seeking compensation for his injuries and her consequent loss of consortium. The defendants, which we will refer to collectively as "Brown," filed a third-party complaint against Parker Brothers Company ("Parker"), Joao's employer, alleging that Parker's negligent maintenance of the machine contributed to

the accident. The contribution claim was severed from the main cause and subsequently dismissed by the district court.

In a trial bifurcated on the issues of liability and damages, the jury found in favor of Joao and Maria and assessed their damages at $75,000 and $7,500, respectively. After reducing Joao's award to reflect the jury's finding of 20 percent comparative negligence, the district court entered judgment on the verdict from which both parties have appealed. Brown claims that its motion for a directed verdict at the close of the evidence on liability should have been granted. Brown also argues that its third-party action against Parker was improperly dismissed. Joao contends that the district court improperly admitted evidence that he was receiving workmen's compensation benefits and failed to instruct the jury appropriately regarding its relevance. He asks for a new trial limited to the issue of damages.

### I.

Joao, a native of the Azores, had been employed at Parker's Taunton, Massachusetts plant from 1968. On July 15, 1981 Joao was working as a "set-up" man. His responsibilities included clearing jams on the thermoformer machine. The machine, approximately 20 feet long, four feet wide, and seven feet tall, was designed automatically to heat sheets of plastic at the oven station, to mold the heated plastic into the desired shapes at the forming station, and to score or trim the shaped plastic sheets at the trimming station. Every twelve seconds the metal trim die would descend upon the lower die and score the formed plastic. After the sheets were trimmed they were removed from the machine and taken to a work table where the plastic products were popped out of the sheets. The forming station and the trimming station, which together measured roughly six

---

* Chief Judge at time case was argued ceased to be Chief Judge on March 31, 1983.

** Became Chief Judge on March 31, 1983.

1. Brown was a division of defendant Koehring Company or defendant Leesona Company at all relevant times.

feet in length, were enclosed by a box-like metal grate or cage. This protective barrier extended from the working level of the machine, roughly four feet above the floor, to a point roughly six feet above the floor. Thus, the cage blocked employee access to the trimming and forming stations and would prevent a worker from inadvertently reaching into the machine and suffering injury. The barrier did not extend across the top of the machine, however, and it was possible for an employee standing on a chair to reach over and into the enclosed sections of the machine. A single gate located near the forming station provided limited employee access to that section of the machine.

The machine was electrically powered and was controlled by eight switches, arrayed in four rows of two per row, on a rectangularly shaped control panel. At the panel's upper left a rotary switch turned the machine's power on and off. To its right was a light which was illuminated when the machine was in operation. Directly below the power switch, a rotary "form station switch" controlled the power to the forming dies. To the right of the form switch was a button that would incrementally advance the plastic through the machine. A toggle switch directly below the form switch controlled the machine's hydraulic system. To its right another toggle switch, known as the "blow form station," controlled compressed air. A toggle switch located at the lower left of the control panel would, when actuated, delay the operation of the trim die. Another toggle located at the lower right permitted an operator to turn off, not merely delay, the trim station. The evidence suggested that these two trim toggle switches were between three and six inches apart. Once these switches were properly set, it was unnecessary for an employee to control manually the operation of the machine.

Shortly before the accident, the supervisor, John O'Neill, was informed that plastic sheets were jamming in the trim die and requested Joao to clear the machine. Joao went to the control panel intending to turn off the toggle switch on the lower right which controlled power to the trim station.

The parties dispute whether Joao actually turned off the form switch or the trim delay switch, but it is clear that he failed to turn off the trim station switch. Unable to reach the jam at the trim die station through the forming station access gate, Joao placed a chair next to the machine and reached over the barrier cage to remove the plastic from the trim die. As he reached into the machine, the upper die descended and cut off parts of three of his fingers.

Dr. Igor Paul, a professor of mechanical engineering at the Massachusetts Institute of Technology, testified that, in his opinion, the machine was defectively designed in four respects. First, he testified that the barrier cage should have had four interlocked access doors, two on each side of the machine. These doors would have permitted safe access to the interior of the machine because the interlocks, devices that resemble the mechanism that turns a refrigerator light on and off, would have automatically shut off the machine's electrical power supply when the doors were opened. Dr. Paul testified that at the time the machine was manufactured, interlocked access doors, a common industrial safety feature, would have cost $50 to install. Second, Dr. Paul testified that the machine was defective in that there were no easily accessible emergency switches for immediate shut down of the machine. There was evidence that, at the time of the accident, Joao may have been groping for such a switch or at least that his left hand was near a position where such a switch might have readily been installed. Third, Dr. Paul testified that the four tightly clustered toggle switches on the control panel were confusing and apparently contributed to Joao's mistaken failure to turn off the trim station. He viewed their close proximity, and similar appearance and function as a defect in design. Fourth, he stated that the machine was defective because there were no warnings attached to the machine describing the risks involved in working on the machine and no instructions explaining the proper use of certain wooden safety blocks that had been included with the machine.

Joao testified that he had never been instructed in the use of such blocks.

Plaintiffs also introduced evidence that Brown had received post-sale information concerning hazards associated with various features of the machine that it never communicated to Parker. Brown stipulated that it had been informed of three instances in which an operator of a similar machine had mistakenly turned off the wrong toggle switch. The employee responsible for handling Brown's products liability claims testified that the control panel had been redesigned to replace three of the four toggle switches with rotary type switches. A few months after the machine in question was sold, moreover, Brown redesigned the single access gate in the barrier to include interlocks. Finally, the instruction manuals that Brown shipped with later thermoformers contained for the first time a specific description of the use of the safety blocks in connection with maintenance. Parker was not apprised of these developments.

Responding to special questions, the jury found that Brown had negligently designed the thermoformer and had failed to warn of certain hidden or latent defects in the machine—both those existing at the time of the sale and those discovered after the sale. The jury further found that the breach of each of these duties was a proximate cause of Joao's injuries. In assessing comparative fault for the accident, the jury found that 80 percent of Joao's injuries was attributable to Brown's negligence and that 20 percent was attributable to his own fault.

## II.

■ We first consider the propriety of the district court's refusal to grant defendants' motion for a directed verdict at the close of evidence. Under Massachusetts law, the role of the reviewing court is limited to determining whether, viewing the evidence in the light most favorable to the plaintiffs, there was any combination of circumstances from which a rational inference may have been drawn in favor of the plaintiff. *See Uloth v. City Tank Corp.,* 376 Mass. 874, 876, 384 N.E.2d 1188, 1190 (1978);

*Stewart v. Roy Bros.,* 358 Mass. 446, 448, 265 N.E.2d 357, 359 (1970). We conclude that the district court properly denied defendants' motion.

Brown argues that the evidence concerning the installation of interlocked access doors was inadequate to support an inference of negligent design. Brown introduced evidence that the interlocks would have cut off power to the entire machine, not just to the trim station, resulting in the melting of plastic in the oven station. Whether the delays and costs associated with such melting justified the absence of interlocked access doors, however, was a factual question for the jury.

Brown also contends that there was no causal connection between its failure to install interlocked access doors and the injury to Joao, since Joao had reached over the protective barrier and into the machine. Plaintiffs' expert, Dr. Paul, agreed on cross-examination that interlocked doors would not have protected Joao against similar injury. But the jury was entitled to infer that had the machine been equipped with access doors, Joao would not have reached over the barriers to clear the jammed trim die. Dr. Paul testified that four doors, two on each side, would have provided safe employee access to all sections of the enclosed area. With these doors in place, Joao would have had no reason to reach over the barrier guard.

In arguing that the evidence that it defectively designed the control panel should not have gone to the jury, Brown points to the testimony of Joao's supervisor, John O'Neill. O'Neill testified that, after the accident, he inspected the control panel and learned that the trim station switch, which was located at the panel's lower right, had not been turned off. There is some dispute as to whether Joao actually flipped the trim delay switch, an identical toggle switch located to the immediate left of the trim station switch, or the relatively dissimilar rotary form switch located to the left of and two rows above the trim station

switch.[2] Whatever the merits of this factual dispute, the state of the evidence fully warranted submitting the issue to the jury.

While conceding it had a duty to design the machine with reasonable care, *doCanto v. Ametek, Inc.,* 367 Mass. 776, 782, 328 N.E.2d 873, 877 (1977), Brown argues that it had no duty to anticipate and design against an employee's consciously reckless act of reaching into the works of an operating machine. Brown points to a dictum of the Massachusetts Supreme Judicial Court in which the court distinguished "foreseeable lapses" from "careless or consciously reckless" behavior; the court stated that a "worker or other user of a potentially dangerous product is not freed of responsibility to exercise due care in the use of the product." *Uloth v. City Tank Corp.,* 376 Mass. 874, 880 n. 6, 384 N.E.2d 1188, 1192 n. 6 (1978). Recognizing that this dictum draws no bright distinction between cases in which careless conduct merely reduces a plaintiff's recovery through the application of comparative negligence principles and cases in which it bars recovery altogether, Brown relies on cases from other jurisdictions for the proposition that recovery is barred as a matter of law when a plaintiff reaches into an obviously dangerous machine. Thus in *Sowles v. Urschel Laboratories, Inc.,* 595 F.2d 1361 (8th Cir.1979) (Minnesota law), recovery was denied where the plaintiff had reached into a clogged dicing machine after having inadvertently failed to switch off the power. In *Bartkewich v. Billinger,* 432 Pa. 351, 247 A.2d 603 (1968), the court denied recovery as a matter of law to a plaintiff who reached into a glass breaking machine while it was in operation.

Brown, however, has read too much into the *Uloth* court's dictum. There, the manufacturer of a trash hopper that had been installed on a refuse truck appealed from a jury verdict in favor of a worker whose foot was amputated when he jumped to the rear step of the truck and exposed his foot to the scissors-like action of the hopper. The manufacturer argued that the risk of injury from exposure to the hopper was patently obvious and therefore foreclosed recovery for negligent design. The Supreme Judicial Court rejected this contention, emphasizing that the law " 'ought to discourage misdesign rather than encouraging it in its obvious form.' " *Uloth,* 376 Mass. at 881, 384 N.E.2d at 1193 (*quoting Palmer v. Massey-Ferguson, Inc.,* 3 Wash.App. 508, 517, 476 P.2d 713, 719 (1970)). In the course of its discussion, the court observed that a patently dangerous condition may tend to warn employees to exercise caution, but it does little to reduce the risk of injuries resulting from instinctive reactions, momentary inadvertence, or forgetfulness on the part of a worker. Recognizing the effectiveness of certain safety devices in reducing the likelihood of injuries resulting from such foreseeable lapses, the court concluded that

---

2. On direct examination, O'Neill testified as follows:

Q. After [plaintiff] left did you go to the machine?
A. Yes, I went to the machine.
Q. What did you observe there?
A. I observed there that the blow form station was off but the trim die station was on.
Q. All right. You have introduced a new term here. You said the "blow form station"?
A. The blow form station, or I should say the form station, yes. The form station was on.

After having his attention redirected to the control panel O'Neill testified later:

A. Well, when I got there the trim station was still on but the form station was off.
Q. There was an electrical toggle switch immediately to the left that was off?

A. Yes, that was off.

Brown would have us conclude on the basis of this testimony that Joao actually turned off the rotary form switch—a switch that differed dramatically in function, location and operation from the trim station toggle switch he intended to flip. Certainly if the jury had accepted Brown's version of the facts, it might have concluded that Joao's injury was more directly caused by his own negligence than by the company's confusing design of the panel. But O'Neill's testimony supports two alternative versions of events, either that Joao flipped the trim delay toggle located to the left of the trim station or that he flipped the blow form toggle above the trim station. Both versions are consistent with plaintiffs' contention that, in location and function, the toggle switches were deceptively similar and contributed to the accident. Plainly, this was an issue for the jury.

such issues as whether the danger was obvious and whether feasible design alternatives would have prevented the accident were to be submitted to the jury. *Uloth,* 376 Mass. at 880–81, 384 N.E.2d at 1192–93.

■ *Bartkewich* is similarly distinguishable. There the plaintiff argued that the manufacturer should have installed a protective barrier to prevent employee access to the works of an obviously dangerous glass breaking machine. The court denied recovery because it was satisfied that the employee had no business reaching into the machine. Here, by contrast, the evidence suggested that Parker employees reached into the thermoformer routinely to clear the trim dies of excess plastic. A Brown employee admitted that the Company was aware that plastic sheets became stuck in the trim die station and that employees may have reached into the machine to remove these jams. That the protective barrier failed to enclose the trim die station completely, and that the barrier was equipped with an access door, suggest that Brown anticipated that the efficient operation of the thermoformer would require employees to clear the machine periodically. The Massachusetts cases make clear that a manufacturer must anticipate the environment in which its product will be used and design against reasonably foreseeable risks attending the product's use in that setting. *Back v. Wickes Corp.,* 375 Mass. 633, 640–41, 378 N.E.2d 964, 969 (1978). And *Uloth* makes clear that such risks may include reasonably foreseeable carelessness by machine users. *See also Schell v. AMF, Inc.,* 567 F.2d 1259, 1262–63 (3d Cir.1977) (reversing entry of judgment in favor of manufacturer-defendant where evidence suggested that the risk of plaintiff's carelessness was foreseeable; *Bartkewich* distinguished). While the jury was entitled to, and did, find that Joao's negligence contributed to his injury, it was also free to conclude—on the basis of either the alleged defects in the control panel or the absence of interlocked safety doors—that Brown had not used reasonable care when it designed a machine inducing users to adopt unsafe procedures to remove excess plastic. Thus we sustain the jury's finding of liability on the negligent design count.

The jury likewise found for plaintiff on two counts alleging negligent failure to warn. Because the evidence on the negligent design count was sufficient, we do not reach Brown's further contention that the evidence was insufficient as to these.

■ Brown contends that the district court improperly dismissed its third-party action against Parker. Brown argued below that the evidence supported a finding that Parker had negligently maintained and serviced the thermoformer thereby contributing to Joao's injury and to his wife's consequent loss of consortium. Following its severance from the main case, the parties agreed to try this claim to the judge on the facts adduced at trial. The district court judge, weighing both the evidence and the jury's answers to the special questions, concluded that Brown had failed to prove its claim of negligence. There is no contention on appeal that the district court committed reversible error in its assessment of the evidence of Parker's negligence. Rather, Brown argues that Joao's negligence in maintaining and servicing the thermoformer is attributable to Parker under Massachusetts law of vicarious liability, with the result that Parker is liable as a matter of law for a portion of Maria's loss of consortium. This theory was never raised below, however, and we think it too late to be considered now. *See Johnston v. Holiday Inns, Inc.,* 595 F.2d 890, 894 (1st Cir.1979).

### III.

■ Among the issues joined at the trial on damages was the extent of Joao's disability and the consequent expected loss of future earnings capacity. Defendants introduced evidence that in March 1982, some three months after he had undergone surgery to remove painful "neuromas" from his amputated stumps, Joao declined a job as a press operator with Parker that would have paid approximately $183 per week. Joao testified that he declined the job be-

cause he lacked the physical capacity to perform certain associated lifting and carrying requirements. Joao's physician testified that Joao had suffered a 40 percent loss of function in his right hand, and that this loss would significantly limit his ability to perform lifting and gripping. Joao's counsel introduced Parker's description of the press operator job, which indicated that a certain amount of such gripping would have been required.

Attempting to convince the jury that Joao could have performed the tasks required by the press operator position and had other reasons for declining the job, Brown introduced evidence that Joao was then receiving $185 per week in workmen's compensation disability benefits. The plaintiff strenuously objected to the admission of this evidence and demanded a curative instruction. During a pretrial discussion the judge had stated that in his view such evidence would be relevant to Joao's motivation in declining employment and would be admitted for that limited purpose. When the evidence was introduced at trial, the judge interjected the following limiting instruction:

this line of questioning about the Workmen's Compensation check he has been getting is being admitted for a very limited purpose. You heard him say or testify he was offered a job and he declined the job, and this testimony about how much he is getting on Workmen's Comp. is being admitted to the extent it helps you decide whether he declined the job because of the fact he was receiving the compensation or he declined the job because of his actual inability to handle the job, and that is the purpose—and the only purpose—for which you are to consider this evidence. It bears on his motivation

in declining the job and its admissibility is limited to that extent.

In his final instructions to the jury the judge reiterated this cautionary instruction, as follows:

Now this morning you heard some evidence about the fact that Mr. DeMedeiros had been receiving $185.00 a week as Workmen's Compensation benefits. I told you when that was admitted in evidence, and I am telling you again now, that was limited to the issue of whether or not his refusal of the job was due to the fact he preferred to receive that compensation [or] due to the fact he didn't honestly feel able to take the particular job, and that is the only function you should attribute to that Workmen's Comp. Otherwise you have no interest and it should not enter into your deliberations for any other purpose than bearing on the credibility of the reason he gave for declining the job.

Plaintiff contends that the evidence of workmen's compensation receipts should have been utterly excluded because the danger of unfair prejudice outweighed any probative value. Fed.R.Evid. 403. Of particular concern to plaintiff is the possibility the jury reduced the plaintiff's award by the amount of the workmen's compensation benefits. This would have been improper since the Massachusetts statute provides, in substance, that an injured employee who recovers in tort from a third party must repay workmen's compensation benefits out of his personal injury award. *See* Mass. Gen.Laws ch. 152, § 15.[3]

In contending that a federal court should adopt a rule of per se inadmissibility, or should at least require the defendant to present other evidence of malingering, the plaintiff cites to *Eichel v. New York Central R.R.,* 375 U.S. 253, 84 S.Ct. 316, 11

---

**3.** A few state courts have adopted a rule of per se inadmissibility. *E.g., Richmond County Hospital Authority v. Haynes,* 121 Ga.App. 537, 174 S.E.2d 364 (1970). Other states permit the admission of such evidence with an appropriate limiting instruction, but only where the defendant has presented other evidence substantiating the likelihood of malingering. *See, e.g., Hrnjak v. Grayman,* 4 Cal.3d 725, 94 Cal.Rptr. 623, 484

P.2d 599 (1971). The majority of states, including Massachusetts, *see McElwain v. Capotosto,* 332 Mass. 1, 122 N.E.2d 901 (1954), leave the question of admissibility to the discretion of the trial court, with the requirement that a limiting instruction be given should the evidence be admitted. *See generally* Annot., 47 A.L.R.3d 234 (1973). That was the procedure followed here.

L.Ed.2d 307 (1963). There an employee sued his employer under the Federal Employers' Liability Act and the district court disallowed evidence of receipt of a disability pension under the Railroad Retirement Act when offered to show a motive for not returning to work. The Second Circuit ruled that it was error to exclude the evidence, but the Supreme Court reversed, upholding the district court's exclusion. In so doing, the Court said the evidence would "violate the spirit of the federal statutes." *Id.* at 255, 84 S.Ct. at 316.

In diversity negligence cases, this circuit has refused to extend the holding in *Eichel* beyond its federal statutory context. *Thompson v. Kawasaki Kisen, K.K.,* 348 F.2d 879 (1st Cir.1965). Although *Thompson* was decided before the current Federal Rules of Evidence, those Rules confer broad discretion upon the district court to weigh unfair prejudice against probative value. *See* Fed.R.Evid. 403; *Dente v. Riddell, Inc.,* 664 F.2d 1, 5 (1st Cir.1981). *See also* Fed.R. Evid. 105 (evidence may be admitted with a limiting instruction if inadmissible for one purpose). Here, if the jury had not known of the workmen's compensation payments, it would have had no explanation of Joao's refusal to return to work *except* his disability. The evidence was thus of more than borderline probativeness, and we see no abuse by the lower court in admitting it. The court's handling of the matter was consistent with the practice in the Massachusetts state courts, and we do not think *Eichel* was intended to impose a hard and fast federal rule in a diversity context. Even in *Eichel,* moreover, as Justice Harlan pointed out in his concurrence, the narrower question was simply whether or not to uphold the district court's discretionary ruling; the Court in fact did so there, as we do here. *Cf. Savoie v. Otto Candies, Inc.,* 692 F.2d 363, 371 n. 8 (5th Cir.1982).

A more troublesome question is the sufficiency of the court's limiting instruction, quoted earlier. Plaintiff complains this made no mention of the fact the workmen's compensation insurer would be entitled to recover from the award sums paid earlier and in the future to plaintiff. Mass.G.L. c. 152, § 15. The district court initially indicated it was disposed to mention this, but later did not. No reason for the omission was stated, and plaintiff made a timely objection. Plaintiff contends that this omission may have led the jury to reduce the damages by the $185 weekly compensation payments.

We think the explanation should have been given but do not believe the jury was misled in this case. The limiting instruction that was given came after a correct and concise description of all the elements the jury was to consider in calculating damages, as well as after an instruction that the "mathematics" of reducing the damages by the jury's earlier-found 20 percent contributory damages factor would be done later by the judge and lawyers. Then came the flat direction not to include the weekly $185 workmen's compensation benefits in its deliberations. In that context, the limitation was a clear prohibition against reducing damages by that sum. Its force was underscored by the previous instruction to let the court and attorneys effect the reduction for contributory negligence. The central message was that the court knew what it was about in this rather technical business and would handle any appropriate offsets itself.

Thus we do not think the omission of the explanation constituted reversible error here. We believe, however, that such an instruction should ordinarily be given when requested, since by reassuring the jury that double payment will not, in fact, occur, it avoids any possible disposition by the jury to reduce the award improperly. There are, to be sure, complexities in the Massachusetts workmen's compensation law which make it unwise for a court to get deeply into this matter; and an inartful explanation could be taken to imply that plaintiff's duty to repay the insurer is some reason for the jury to increase the award. We think it would suffice for the court to instruct tersely that the jury should not deduct workmen's compensation receipts in computing damages since plaintiff will later be required by law to repay any such receipts from the award.

*The judgments in Nos. 82–1542 and 1543 are both affirmed.*