Kathleen SHURAS, Joseph
Shuras, Plaintiffs

v.

INTEGRATED PROJECT SERVICES,
INC., Kuhlman Technologies, Inc.,
Paul Mueller Company, Defendants.

No. CIV.A. 99–40044–NMG.

United States District Court,
D. Massachusetts.

March 7, 2002.

Evan T. Lawson, Lawson & Weitzen, Boston, MA, for Plaintiffs.

Joseph F. Leighton, Jr., Kenner, Engelberg, DaDalt & Bratcher, Boston, MA, Patrick J. Riley, Riley, Burke & Donahue, Danvers, MA, John P. Knight, Morrison, Mahoney & Miller, Boston, MA, for Defendants.

## MEMORANDUM & ORDER

GORTON, District Judge.

Kathleen Shuras ("Shuras") and Joseph Shuras brought this suit against defendants Integrated Project Services, Inc. ("Integrated"), Kuhlman Technologies, Inc. ("Kuhlman") and Paul Mueller Company ("Mueller"), alleging 1) negligence, 2) breach of warranty, 3) violation of M.G.L. c. 93A, 4) breach of contract and 5) loss of consortium. Shuras seeks damages for workplace injuries she sustained while calibrating a Mueller water-for-injection tank ("WFI tank"). The defendants participated, albeit in different roles, in the selection, purchase and sale of the WFI tank involved in Shuras' injury. Defendant Kuhlman, in turn, filed a six-count cross-claim against Integrated and Mueller for indemnification and contribution.

This diversity action is before this Court pursuant to 28 U.S.C. § 1332. The plaintiffs are Massachusetts residents and defendants Integrated, Kuhlman and Paul Mueller are incorporated and have their respective principal places of business in Washington, Pennsylvania and Missouri.

Currently pending before this Court are motions by Kuhlman and Mueller for summary judgment.

### I. Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (*quoting Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990)). In cases such as this one where the moving party does not have the burden of proof at trial, that party nevertheless must offer sufficient evidence to support its motion. *Celotex v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265, (1986). Once the

moving party has satisfied its burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine, triable issue. *Id.* at 324, 106 S.Ct. 2548. The Court must view the entire record in the light most hospitable to the nonmoving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir.1993).

## II. *Factual Background*

For the purposes of the summary judgment motion, this Court construes the record in the light most favorable to the nonmoving party. *Lohnes v. Level 3 Communications, Inc.,* 272 F.3d 49, 50 (1st Cir.2001).

On March 13, 1996, Shuras suffered serious burn injuries after she attempted to calibrate a 1,000–gallon Mueller WFI tank at the Hopkinton facility of her employer, Seragen, a biotechnology company. Since 1994, Shuras has been a calibrator at Seragen responsible for ensuring the proper operation of gauges and probes on pharmaceutical equipment such as the WFI tank.

### A. WFI Tank

### 1. Chart recorder

The WFI tank operates in conjunction with a condensing unit and a pure steam generator to condense clean steam into a 1,000–gallon storage tank to produce pyrogen-free water for pharmaceutical products. A chart recorder is an optional device sometimes used with the tank to record the temperature inside the tank through a resistance temperature device ("RTD"), a temperature measuring probe. The chart recorder creates a permanent record of the temperature inside the tank, ensuring that the water temperature never falls below 80° Celsius (176° Fahrenheit).

### 2. Thermowell

A thermowell is a stainless steel housing that isolates the temperature measuring probe (such as an RTD) from the contents of the WFI tank. Although there are several possible designs for thermowells, two are at issue here: 1) a thermowell that is affixed to the tank to create a barrier between the interior and exterior of the tank so that a temperature measuring probe such as an RTD can be removed even when the tank has hot water inside and 2) a thermowell welded to a cap on the tank in which the RTD sits directly in the contents of the tank which cannot be removed while the tank is full. In the pharmaceutical industry, the first described thermowell is standard.

### B. Sales transaction

In September, 1992, Kuhlman, an importer and distributor of pharmaceutical machinery, contacted Seragen regarding Mueller's product line, including the WFI tank. That contact was made after Integrated, a biotechnology equipment consulting firm, had initially approached Kuhlman on Seragen's behalf. In its capacity as the exclusive agent and distributor of many of Mueller products, Kuhlman submitted price quotations to customers and, in turn, received orders for Mueller.

The present case, by all appearances, involves an ordinary sales transaction among sophisticated business entities. Kuhlman provided Mueller's price quotation and a conditional purchase order to Seragen on December 30, 1992. Approximately two weeks later, Kuhlman sent an order confirmation to Seragen indicating that Seragen had purchased, *inter alia,* a WFI tank with a temperature indicator and a second thermowell for $59,280. Kuhlman's confirmation notice reflected an

additional $2,000 for the temperature indicator and the second thermowell because they were not standard features with the tank but the notice neither specified the kind of thermowell nor its location.

On January 22, 1993, Mueller issued an invoice to Seragen for the tank that, among other things, confirmed the sales price and the order of "one additional thermowell". Mueller issued a final invoice to Seragen with the same terms as the invoice and Seragen paid the purchase price directly to Mueller. Kuhlman received a sales commission of $6,069.

Mueller promptly shipped the WFI tank to Seragen and Integrated and Kuhlman installed it in June and July 1993. On September 3, 1993, a Kuhlman employee "started up" the tank and, as part of his duties, trained Seragen personnel and configured and calibrated the chart controller and temperature control.

### C. The Accident

For more than 30 months, until March, 1996, the WFI sat idle because Seragen was awaiting approval from the Food and Drug Administration for some of its product line. Although Kuhlman and Seragen had calibrated the tank while it was idle and empty, no Seragen employee had attempted to calibrate the tank while it was full of water.

Shuras made the first attempt by a Seragen employee to calibrate the tank while it was full on March 6, 1996 during the Installation Qualification protocol for the tank. Moises Sabio ("Sabio") a validation engineer in the Calibration Department at Seragen in charge of the protocol, supervised the calibration. In preparing for the Installation Qualification, Sabio referred to the WFI owner's manual and the purchase documents, including the quote for the tank. Based upon those references, Sabio advised Shuras that it was safe to calibrate

the tank while it was full of hot water and still in operation because he understood that the RTD was located at the second thermowell.

Relying upon Sabio's instruction that there was a second thermowell affixed to the tank where the RTD was located, Shuras unscrewed the clamps securing the probe to the tank, causing the tank to expel scalding hot water onto her, burning her lower abdominal and upper leg region. Shuras brings the instant lawsuit to recover for those injuries.

### III. *Discussion*

#### A. Negligent Design

■■■■ An action for negligent design "begins with the allegation that the defendant has breached a duty and that this breach of duty has caused actual harm." *Cigna Ins. Co. v. Oy Saunatec, Ltd.*, 241 F.3d 1, 15 (1st Cir.2001) (hereinafter "*Saunatec* "). It is well established that a manufacturer has a duty to design products with reasonable care and is held to the standard of "an ordinary reasonably prudent designer in like circumstances." *Fahey v. Rockwell Graphic Sys., Inc.*, 20 Mass.App.Ct. 642, 647, 482 N.E.2d 519 (1985) (overruled on other grounds in *Allen v. Chance*, 398 Mass. 32, 33–34, 494 N.E.2d 1324 (1986)).

■■■■ A manufacturer must design a product to eliminate avoidable dangers, placing a duty upon it to assess both the manner and the environment in which consumers will use the product. *Id.* In that regard, the focus in negligent design cases is "not on how the product is meant to function, but on whether the product is designed with reasonable care to eliminate avoidable dangers." *Uloth v. City Tank Corp.*, 376 Mass. 874, 878, 384 N.E.2d 1188 (Mass.1978). Avoidable dangers "include reasonably foreseeable carelessness by

machine users". *DeMedeiros v. Koehring,* 709 F.2d 734, 739 (1st Cir.1983); *McIsaac v. Didriksen Fishing Corp.,* 809 F.2d 129 (1st Cir.1987). As a policy matter, manufacturers have an affirmative duty to recognize and cure design defects because they can more efficiently do so than ordinary users. *Saunatec,* 241 F.3d at 15.

Even when the manufacturer designs a product that creates a risk of foreseeable harm, however, the cornerstone of a court's inquiry is reasonableness, not perfection. *Marchant v. Dayton Tire & Rubber Co.,* 836 F.2d 695, 698 (1st Cir. 1988). Several factors guide that determination by the finder of fact: 1) the severity of the danger posed by the design, 2) the likelihood that such a danger would occur, 3) the feasibility and the cost of alternative designs and 4) the consequences of the alternative design. *Back v. Wickes Corp.,* 375 Mass. 633, 642–43, 378 N.E.2d 964 (1978). A court's conclusion that "a defendant has negligently designed a product is tantamount to a finding that the product is unfit for ordinary use." *Saunatec,* 241 F.3d at 16; *Hayes v. Ariens Co.,* 391 Mass. 407, 409, 462 N.E.2d 273 (1984) (overruled on other grounds in *Vassallo v. Baxter Healthcare Corp.,* 428 Mass. 1, 696 N.E.2d 909 (1998)).

## B. Implied Warranty of Merchantability

By analogy, under the implied warranty of merchantability, a manufacturer guarantees that its products are "fit for the ordinary purposes for which such goods are used." *Allen,* 398 Mass. at 33–34, 494 N.E.2d 1324; M.G.L. c. 106 § 2–314(2)(c)). Although there is significant overlap between the inquiries of a court with respect to negligence and warranty claims, the emphasis in the latter is on the product. *Wasylow v. Glock, Inc.,* 975 F.Supp. 370, 377 (D.Mass.1996). As in a negligent design case, the manufacturer must anticipate the environment and manner in which consumers will use its products, including foreseeable misuses. To sustain her burden, a plaintiff must show that "at the time of [her] injury [s]he was using the product in a manner that the defendant, seller or manufacturer reasonably could have foreseen." *Saunatec,* 241 F.3d at 16.

Although ostensibly broad in scope, liability under either theory is not without bounds. The touchstone of a negligent design or warranty analysis is foreseeability. A manufacturer must anticipate and design for both intended and reasonably foreseeable uses of its products, placing a duty upon it to ensure that its "product will withstand, in a reasonably safe manner, foreseeable misuse incident to or arising out of the product's intended use." *Id.* at 16 (citing *Venezia v. Miller Brewing Co.,* 626 F.2d 188, 190 (1st Cir.1980) (internal quotations omitted)).

## C. Kuhlman's Alleged Liability

Although Massachusetts law imposes different duties upon manufacturers and sellers, Shuras makes few tangible distinctions between Mueller and Kuhlman in her pleadings. Restatement (Second) Torts § 402 (noting in Comments that "[t]here is a clear distinction between the liability of a manufacturer and that of a seller of goods made by another . . ."). Kuhlman contends that plaintiff's negligent design claims against it must fail because it is undisputed that it neither assumed a role in the design and manufacture of the tank nor owed a duty to the plaintiff with respect to the tank design. Kuhlman functioned as a sales representative involved in product promotion and customer relations, ensuring that the administrative end of the transaction went smoothly from the time of sale to delivery.

Kuhlman's limited role does not, however, shield it from liability. In a negligence or a warranty action, Kuhlman, as the seller of the tank, is liable if it knew or had reason to know of the dangerous condition that caused Shuras' injury. *Id.; Enrich v. Windmere Corp.*, 416 Mass. 83, 86, 616 N.E.2d 1081 (1993); *Fernandes v. Union Bookbinding Co.*, 400 Mass. 27, 32, 507 N.E.2d 728 (1987). As the term is used in the Restatement, "reason to know" is a term of art. It imposes no duty on the seller to ascertain unknown facts that it "should know." Restatement (Second) Torts §§ 401 and 402. Rather, a seller may be liable only if, because it possesses more relevant information about a product's design and its concomitant hazards, it is in a better position than a buyer to know that the product is dangerously defective.

Shuras offers no evidence to suggest that Kuhlman *knew or had reason to know* of any defects in the tank. Although Kuhlman, a major agent of Mueller, was allegedly aware that Seragen would have to calibrate the tank regularly and that there were certain hazards inherent in its use, those facts alone do not suggest that Kuhlman understood the technical facets of the tank or the attendant risks so as to make it liable in a negligence or warranty action. Notwithstanding Shuras' arguments to the contrary, Kuhlman's involvement in the "start-up" of the tank neither suggests that it knew of the putative defects in the tank nor that it should be subject to the same level of liability as the manufacturer.

Finally, the plaintiff presents no convincing argument that Kuhlman was a knowledgeable seller with an elevated duty to take reasonable precautions against potential hazards such as internal inspection of the tank. *Everett v. Bucky Warren, Inc.*, 376 Mass. 280, 287–88, 380 N.E.2d 653 (1978); *Feliciano v. Andersen Corp.*,

1995 WL 1146822 (1995); *Coyne v. John S. Tilley Co., Inc.*, 368 Mass. 230, 241, 331 N.E.2d 541 (1975). Because Kuhlman assumed no role in the transaction that would bear upon the design or manufacture of the tank, there can be no inference that it could have foreseen the harm to Shuras so as to impose on it liability for a faulty design or a failure to warn.

### D. Mueller's Alleged Liability

The theory upon which Shuras advances her negligent design case is coextensive with her claim of breach of the implied warranty of merchantability. She would impose liability on the manufacturer for failing to act, i.e., by not installing a second thermowell, Mueller failed to design a WFI tank with reasonable care so as to eliminate foreseeable risks such as the release of scalding water during the calibration process. Shuras alleges that the defendant, consequently, placed into the stream of commerce a dangerous and defective product.

Shuras argues that an injury of the kind she suffered from use of the WFI tank was foreseeable to Mueller because it was aware that Seragen would need to calibrate the tank regularly and should have anticipated that a Seragen employee might attempt to do so while the tank contained water. According to Shuras, the addition of a thermowell was not only a reasonable design modification but also ostensibly within the contemplation of the parties because it was noted in Seragen's purchase order. By implication, Shuras argues that Seragen paid extra consideration for the second thermowell because it was a necessary and reasonable design alternative.

In response, Mueller argues that the design of the tank was not defective but rather that Shuras, under the direction of Sabio, calibrated the tank improperly. As

an initial matter, Mueller notes that Seragen, Shuras' employer, did not complain that the tank was defective or otherwise dangerous. Moreover, Mueller asserts that it is common knowledge in the pharmaceutical industry that the method of tank calibration depends upon the location of the temperature probe. Sabio, allegedly a sophisticated calibration engineer, and Shuras, an experienced calibration technician, were aware that the location of the temperature probe had an impact on the proper calibration procedure. Mueller suggests that, given the knowledge and experience of Shuras and other Seragen personnel, the misuse of the WFI tank by Shuras was not foreseeable.

 Mueller bases its argument upon a rather narrow reading of "foreseeability" and "misuse", terms of art with an attendant distinct legal meaning. "Unforeseeable misuse concerns the question whether the defendant could have reasonably foreseen that the plaintiff would misuse the product in the way he did." *Saunatec*, 241 F.3d at 18 (quoting *Allen*, 398 Mass. at 36 n. 2, 494 N.E.2d 1324) (internal quotations omitted). In order to justify the misuse defense, the defendant must show that Shuras' purported misuse of the tank was unforeseeable. *Id.* Assuming all reasonable inferences in favor of the plaintiff, there is a genuine issue of material fact as to whether Mueller, the designer and manufacturer of the tank, could have foreseen that a Seragen employee would calibrate a tank without the second thermowell as she did.

 In further support of her case, Shuras posits that this action also should survive summary judgment because a reasonable design alternative was available to Mueller. Where the plaintiff can show that there was a reasonable alternative to the challenged design in a negligence or warranty claim, "there is a case for the

jury." *Uloth*, 376 Mass. at 881, 384 N.E.2d 1188; *see also DeMedeiros*, 709 F.2d at 738–39 (holding that a jury question exists in a warranty action if plaintiff offers evidence that certain safety devices would reduce the risk of injury from employees' "foreseeable lapses"). Consequently, Shuras' argument that the design of the tank was defective and resulted in a breach of warranty because a reasonable design modification, the second thermowell, was readily available puts this case beyond the reach of summary judgment with respect to Mueller.

### E. Failure to Warn as Negligence and Breach of Warranty

Shuras contends that Mueller is also liable to her because it failed to warn Seragen and its employees about the risks associated with use of its tank and provided ambiguous design plans for the WFI tank.

 It is well settled that a manufacturer has duty to warn users of foreseeable latent dangers associated with ordinary uses of its products. *See, e.g., Fiorentino v. A.E. Staley Manufacturing Co.*, 11 Mass.App.Ct. 428, 433, 416 N.E.2d 998 (1981) (collecting cases). Indeed, a manufacturer may be liable if its product functions perfectly but it fails to warn about the product's inherent dangers. *Laaperi v. Sears, Roebuck, & Co., Inc.*, 787 F.2d 726, 729 (1st Cir.1986).

Failure to warn of dangers stemming from *foreseeable* uses or misuses of a product is, by deduction, evidence of liability. Instructions on the use of a product does not discharge a manufacturer's duty to warn. Rather, the strength of the warning "must be commensurate with the dangers involved." *Fiorentino*, 11 Mass.App. Ct. at 434, 416 N.E.2d 998.

Shuras contends that Mueller's failure to provide warnings on the hazards of improper calibration of the tank was negligent. It is undisputed that neither Kuhlman nor Mueller provided Seragen or any of its employees with, *inter alia*, 1) a label, 2) a warning or 3) other notice attached to the tank that it lacked a second thermowell or was otherwise dangerous when calibrated. Shuras contends that the failure to provide such warnings was crucial because not only did Seragen request and pay for a second thermowell but also the design plans provided by Mueller ambiguously designated the location of the thermowell. Because of those alleged causes of confusion, Mueller was in a superior position to know about the tank's design and its consequent dangers.

Shuras also asserts that the gravity of the potential harm associated with calibration of the tank created a duty to warn Seragen employees that there was no thermowell for the RTD or that it was dangerous to calibrate the tank when it was full of water. According to Shuras, it was not evident merely by looking at the tank that it did not contain a second thermowell. She notes that OSHA requires that warnings be placed on equipment such as the WFI tank when a significant risk of injury exists. After Shuras' accident, Seragen posted the appropriate warnings on the tank on its own initiative.

■ Mueller, for its part, alleges that the pharmaceutical industry is quite sophisticated and that lengthy warnings are simply not necessary because individuals working with the tank are knowledgeable about the equipment. Shuras, an experienced calibration technician, was purportedly aware of the dangers associated with calibrating a WFI tank and her injury resulted from a combination of Sabio's negligence and her own. Indeed, a manufacturer has no duty to warn of "product-connected dangers that are obvious or to give warnings to someone who already knows of the product's hazardous propensities." *Id.* at 436, 416 N.E.2d 998.

■ Although a knowledgeable user cannot recover if he understood the danger, "past experience with a product... will not necessarily alert users of all dangers associated with it." *See, e.g. id.; Everett*, 376 Mass. at 289–90, 380 N.E.2d 653 (finding that the issue of contributory negligence in a design negligence case is usually a jury question). The duty to warn, in any event, is defined by the sophistication of the average purchaser of the product in question and "[w]hether a particular warning measures up to this standard is almost always an issue to be resolved by a jury." *Laaperi*, 787 F.2d at 731–732 (quoting *MacDonald v. Ortho Pharmaceutical Corp.*, 394 Mass. 131, 475 N.E.2d 65 (1985), *cert denied* 474 U.S. 920, 106 S.Ct. 250, 88 L.Ed.2d 258 (1985)).

While it is true that Shuras and Seragen were knowledgeable users, they were evidently not aware of the full scope of the tank's hazards. Allocation of fault is not a precise science because "the absence of negligence and the existence of contributory negligence, are sometimes but two ends of the same stick." *Gadowski v. Union Oil Co. of Boston*, 326 F.2d 524, 525 (1st Cir.1964). However, it is axiomatic that if such factual issues remain, they are properly resolved by a jury. *See* 11 Moore's Federal Practice § 56.11[5][b] ("Much jury activity is devoted not to determining physical facts but to construing them," including whether given conduct constitutes negligence or contributory negligence.)

## F. Causation

To survive summary judgment, the plaintiff must offer some proof that Mueller's alleged negligent design or failure to warn was the proximate cause of her inju-

ry. In that regard, plaintiff's expertise is relevant if, as a sophisticated user, she already was aware of the danger. *See, e.g., Laaperi,* 787 F.2d at 732. If she was so aware, there would be an insufficient causal nexus between the negligent failure to warn and plaintiff's injury. *Id.*

■ Mueller has offered evidence indicating that Shuras and Sabio understood the danger yet took inadequate precautions. It is alleged, for example, that Shuras initially attributed her injuries to Sabio's negligence. Shuras, for her part, has offered expert testimony explaining that neither she nor Sabio knew of the danger attendant to calibrating the tank because of a lack of information in the purchasing documents or on the design plans and a lack of warnings about calibration procedures on the tank or in the instruction manual. Mindful of these factual disputes, it cannot be concluded that, as a matter of law, the alleged multiple failures of the defendant Mueller to warn were not a proximate cause of the plaintiff's injuries. Accordingly, defendant Mueller's Motion for Summary Judgment will be denied with respect to Counts I and II of the Complaint.

## G. Liability Under Chapter 93A

Shuras bases her Chapter 93A claim on the defendants' alleged breach of warranty. Similarly, that claim against Mueller survives summary judgment. Because Kuhlman is not liable under a warranty theory, however, any claims against it pursuant to Chapter 93A must fail. *Wasylow,* 975 F.Supp. at 382.

## H. Breach of Contract

■ In order for a third party to recover under a theory of breach of contract, she must demonstrate that she was an intended rather than an incidental beneficiary of that contract. *See, e.g., Rae v.* *Air–Speed, Inc.,* 386 Mass. 187, 194–95, 435 N.E.2d 628 (1982); *Harvard Law School Coalition for Civil Rights v. President and Fellows of Harvard College,* 413 Mass. 66, 71, 595 N.E.2d 316 (1992). Under Massachusetts law, the standard for determining whether a third-party is an intended or incidental beneficiary comports with Section 302 of the Restatement which provides:

> (1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either
>
> > (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
> >
> > (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.
>
> (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

Restatement (Second) of Contracts § 302 (1981); *Miller v. Mooney,* 431 Mass. 57, 62, 725 N.E.2d 545 ( 2000) (expressly adopting the rule of the Restatement (Second) of Contracts § 302 (1981)).

Because Shuras makes no claim that the addition of the second thermowell would satisfy an obligation owed to her by Seragen, the only basis for contractual relief must lie under Section 302(1)(b).

Pursuant to Subsection 302(1)(b), the contract and the circumstantial setting must demonstrate that the promisee (Seragen) intended to confer the benefit of the contract on the beneficiary (Shuras). Under that section, "the requisite manifestation of the parties' intent may be evinced in the context, as well as the text, of the

contract." *Public Serv. Co. of New Hampshire v. Hudson Light and Power Dept.,* 938 F.2d 338, 341 (1st Cir.1991). For example, where the contract requires performance that will directly confer a benefit on the third-party such as direct payments, courts have found the requisite indicia of intent. *Id.* at 343–45; *Choate, Hall & Stewart v. SCA Serv., Inc.,* 378 Mass. 535, 392 N.E.2d 1045 (1979). As the First Circuit Court of Appeals has noted, Massachusetts courts do not confer intended beneficiary status when a contract's terms "do not provide for the benefits of performance to *flow directly* to the third-party." *Public Service,* 938 F.2d at 343 (emphasis added).

██ Plaintiff's contract claim, as a matter of law, fails because neither the text nor the context of the contract demonstrate an intention to confer upon her a third-party beneficiary status. Without doubt, Shuras would have benefitted had there been a second thermowell on the tank but the execution of the contract was not contingent upon extending that benefit to her. Shuras is no more than an incidental beneficiary and she enjoys no right under Massachusetts law to enforce the contract in question. *Spinner v. Nutt,* 417 Mass. 549, 555–56, 631 N.E.2d 542 (1994).

### ORDER

For the reasons set forth in the Memorandum above, the motion for summary judgment of defendant Kuhlman Technologies, Inc. (Docket No. 39) is ALLOWED and the motion for summary judgment of defendant Paul Mueller Company (Docket No. 34) is, with respect to Count IV, ALLOWED, and, with respect to Counts I, II and III, DENIED.

So ordered.